NATIONAL HOME PRODUCTS, INC., A DELAWARE CORPORATION;
WISCONSIN TOBACCO CO., INC., A WISCONSIN CORPORATION,
PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 1876–75      Filed January 9, 1979.

*George M. Zimmermann* and *Henry W. Cornell III*, for
petitioners.
*Stephen M. Miller*, for respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in
petitioners' income tax as follows:

### NATIONAL HOME PRODUCTS, INC.

| Year | Deficiency |
| --- | --- |
| 1967 | $375,434 |
| 1970 | 22,095 |

### WISCONSIN TOBACCO CO., INC.

| Year | Deficiency |
| --- | --- |
| Apr. 30, 1966 | $2,585.00 |
| Apr. 30, 1967 | 520.00 |
| 1968 | 442.00 |
| 1969 | 1,516.75 |

The deficiencies result from partial disallowance on petitioners'

consolidated return for the taxable year 1970 of a reduction in the closing inventory of National Home Products, Inc., made in computing its cost of goods sold for 1970 and from disallowance of a deduction for legal and professional fees. Resulting loss carryback disallowances account for the deficiencies in the other taxable years.

Petitioners having stipulated that the disallowance of the deduction for legal and professional fees was proper, the issues presented in this case involve the adjustment to National Home Products, Inc.'s ending inventories. These issues are:

(1) Whether petitioners suffered actual shortages in tobacco inventories during 1970 and if so, whether their inventory records are sufficient to establish the amounts thereof.

(2) Whether petitioners had a claim for reimbursement for the value of the missing inventory which had a reasonable prospect of recovery as of December 31, 1970.

(3) Whether the "reasonable prospect of recovery test" set forth in section 1.165–(1)(d)(2)(i), Income Tax Regs., is applicable to casualty losses of inventories.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner National Home Products, Inc., is a Delaware corporation whose principal office at the time of filing of its petition herein was in Buffalo, N.Y. Until April 1, 1974, the corporate name of petitioner, National Home Products, Inc., was Scotten, Dillon Co. Petitioner will be referred to hereinafter as Scotten, Dillon.

Petitioner Wisconsin Tobacco Co., Inc. (hereinafter referred to as Wisco), is a Wisconsin corporation whose principal office at the time of filing of its petition herein was in Viroqua, Wis.

Scotten, Dillon filed its corporate income tax return for the taxable year 1967 with the District Director of Internal Revenue at Detroit, Mich. Wisco filed corporate income tax returns for the fiscal years ended April 30, 1966, and April 30, 1967, and for the year ended December 31, 1968, with the District Director of Internal Revenue at Milwaukee, Wis. Wisco filed its corporate income tax return for the taxable year 1969 with the Internal Revenue Service at Kansas City, Mo. Scotten, Dillon, together with five subsidiaries including Wisco, filed a consolidated

corporate income tax return for the year 1970 with the Internal Revenue Service Center at Andover, Mass.

The principal business activity of Wisco, incorporated in 1961 by Ralph R. Power (hereinafter referred to as Power) and others, was the storage and processing of tobacco. Upon incorporation and throughout the taxable years at issue, Power was president of Wisco. Its vice president, treasurer, and plant manager was James E. Buchen (hereinafter referred to as Buchen). Wisco's tobacco warehouseman was Lynn E. Tryggestad.

Scotten, Dillon's principal business activity was the manufacture and sale of tobacco products, principally chewing tobacco. During the taxable years at issue, Scotten, Dillon stored its tobacco in warehouse facilities owned and maintained by Wisco. Wisco also processed Scotten, Dillon's leaf tobacco into strips and returned it to Scotten, Dillon for manufacture into the final products. Scotten, Dillon was a publicly owned corporation whose common stock was registered under the Securities Exchange Act of 1934 and was traded on the Detroit Stock Exchange.

On July 18, 1967, Scotten, Dillon acquired 100 percent of the outstanding capital stock of Wisco from Power and Buchen in exchange for Scotten, Dillon stock, cash, and payment of liabilities. Power and Buchen were employed by Scotten, Dillon under 5-year contracts. Power became executive vice president of Scotten, Dillon and was elected to the board of directors. In August of 1968, Power became president, treasurer, and chief executive officer of Scotten, Dillon.

A physical inventory of Scotten, Dillon's tobaccos as of October 31, 1969, was conducted by Richard Gross of Price Waterhouse of Milwaukee, Wis. This closing inventory listed 138,038 bales of Wisconsin leaf tobacco with a value of $2,113,085.70; 847 bales of Florida leaf tobacco with a value of $33,439.56; and 228 cartons of wrapper cuttings with a value of $19,152.[1] Scotten, Dillon did not purchase any Wisconsin leaf during November and December 1969. Its Wisconsin leaf inventory per its books as of December 31, 1969 (adjusted to

---

[1]Although not germane to this case, the inventory also listed amounts and values of burley tobacco.

physical), was $1,997,566.40. Scotten, Dillon did not purchase any Wisconsin leaf during 1970.

In January 1970, John Strickler of Lancaster Leaf Tobacco Co. examined Scotten, Dillon's inventories of Wisconsin leaf for possible purchase by Lorillard Tobacco Co. and Lancaster. Thereafter, during the months of February and March 1970, Scotten, Dillon sold in the aggregate 27,651 bales of such tobacco to Lorillard Tobacco Co., Lancaster, and Liggett & Meyers Tobacco Co. On July 24, 1970, Scotten, Dillon entered into an agreement with Lancaster to sell the latter up to 500,000 pounds of Wisconsin leaf. In August 1970, 2,585 bales of Wisconsin leaf were sold to Lancaster, and 1,287 bales were sold in September 1970. On its books, Scotten, Dillon reduced its Wisconsin leaf inventory in the amount of $429,983.95, and charged cost of goods sold in the same amount in order to reflect these transactions.

During the period January 1 to October 31, 1970, Scotten, Dillon's books and records reflected the transfer of Wisconsin leaf to Wisco. As a result of these transfers, Scotten, Dillon reduced its Wisconsin leaf inventory as follows:

| Months | Pounds | Reduction in Wisconsin leaf inventory |
|---|---|---|
| January | 400,000 | $140,000 |
| February | 400,000 | 140,000 |
| March | 400,000 | 140,000 |
| April | 100,000 | 35,000 |
| June | 300,000 | 105,000 |
| July | 100,000 | 35,000 |
| October | 180,000 | 63,000 |
| | 1,880,000 | 658,000 |

Wisco increased its inventory of Wisconsin leaf in like amounts. Scotten, Dillon recorded these transfers by charging intercompany receivables due from Wisco and crediting the inventory account. With the exception of Wisconsin leaf sales by Wisco to third parties, these tobaccos were processed by Wisco and retransferred to Scotten, Dillon and recorded in inventory accounts other than Wisconsin leaf.

However, in September 1970, Strickler told Ernest Summers, executive vice president of Scotten, Dillon, that Wisco employ-

ees had informed Strickler that there was no more Wisconsin leaf in the warehouses to sell Lancaster. After receiving this information from Strickler, Summers visited Wisco's facilities to inquire whether a shortage of Wisconsin leaf existed and arranged with Price Waterhouse & Co. for the taking of an inventory on September 30, 1970. Summers thereafter rescheduled the physical inventory for October 31, 1970.

In the latter part of 1970, Wisco maintained 10 facilities for warehousing tobacco. The locations were referred to in the Monthly Report of Values as of September 30, 1970, and October 31, 1970, submitted by Wisco to the General Casualty Co. of Wisconsin as follows:

1. 520 RR Ave.—Smith; Viroqua, Wis.
2. RR Ave., Holtan #5; Viroqua, Wis.
3. RR Ave., Viroqua Door; Viroqua, Wis.
4. R 504 E. Decker-Pool #2; Viroqua, Wis.
5. 521 RR Ave.—Vir. Bldg. C; Viroqua, Wis.
6. 701–03 Main Street; Blue River, Wis.
7. 3R202 E. State-Bekk. #10; Westby, Wis.
8. 108 E. 2d-Bekk. #6; Westby, Wis.
9. 715–29 RR St.—Lorillard; Readstown, Wis.
10. 539 Patterson Ave.; Lexington, Ky.

The Monthly Report of Values as of September 30, 1970, reported tobacco values at all of these warehouses. In early and mid–1970, Wisco began consolidating its warehouses of tobacco at the Viroqua locations.

On October 31, 1970, Summers and Dennis W. Prouty of Price Waterhouse counted the Wisconsin leaf tobacco stored by Wisco at Viroqua and Westby. Summers and Prouty were taken by Buchen and Tryggestad to these locations. When Summers inquired whether tobacco was warehoused by Wisco at other locations, Buchen and Tryggestad replied negatively. Summers had been informed by Scotten, Dillon's purchasing department that only burley tobacco was stored at the Lexington warehouse.

This interim inventory disclosed that only 8,648 bales of Wisconsin leaf were on hand. This calculation was made by measuring the bulk tobacco. For purposes of this count, no allocation was made between the tobacco owned by Scotten, Dillon and the tobacco owned by Wisco. Scotten, Dillon's

inventory records indicated that in excess of 50,000 bales of Wisconsin leaf should have been on hand as of October 31, 1970.

Therefore, in November 1970, Summers, along with others working under his supervision, commenced an analysis and review of the inventory records and audited physical inventories for the period beginning December 31, 1967, for the purpose of verifying the indicated inventory shortage and ascertaining its amount. The data developed by Summers was reconciled with the audited inventories of bales of Wisconsin leaf as of December 31, 1968, October 31, 1969, and October 31, 1970. The reconciliation revealed to Summers that purchase, sale, and production usage transactions recorded during the period January 1, 1968, through October 30, 1969, verified within 1 percent the accuracy of the audited inventories at the end of each such period. Proceeding upon the assumption that the October 31, 1969, inventory conducted by Price Waterhouse was accurate, the purchase, sale, and production transactions recorded for the period October 30, 1969, to October 31, 1970, when compared to the physical inventory taken October 31, 1970, revealed that a loss of 43,855 bales of Wisconsin leaf had occurred during that period.

As part of his investigation, Summers attempted to account for the tobaccos that had been transferred in the spring of 1970 from warehouses outside of Viroqua to the Viroqua locations as part of an effort by Wisco to consolidate the tobacco inventories in Viroqua. One of the larger concentrations of Wisconsin leaf tobacco had been at the Sparta-American warehouse but Summers was unable to locate records of loading sheets and other similar data regarding the movement by Wisco of tobacco from the Sparta-American warehouse. However, because of the large amounts of tobacco involved, it would have been difficult for an outsider unknown to the Wisco employees to participate in the movement of the tobacco out of the Sparta-American warehouse.

Also, as a result of his investigation, Summers discovered that prior to 1967, in processing Scotten, Dillon's tobacco, Wisco had been substituting an inferior grade of tobacco for the tobacco Scotten, Dillon had transferred to Wisco for processing.

During the period November 1 to December 31, 1970, Scotten, Dillon's books and records reflected the transfer of 152,000 pounds (approximately 3,535 bales at 43 pounds per bale) of

Wisconsin leaf to Wisco, and reduced its Wisconsin leaf inventory in the following amounts:

| Month | Pounds | Reduction in Wisconsin leaf inventory |
|---|---|---|
| November | 100,000 | $35,000 |
| December | 52,000 | 18,200 |

Wisco increased its inventory in like amounts. Scotten, Dillon recorded these transfers by charging intercompany receivables due from Wisco and crediting the inventory account.

As a result of the sales to Lancaster, Lorillard, and Liggett & Meyers Tobacco Co., and the transfers to Wisco heretofore mentioned, Scotten, Dillon's inventories of Wisconsin leaf were reduced per books during 1970 in the amount of $1,141,183.95 after adjustments of $9,680 (as stipulated). Scotten, Dillon's inventory of Wisconsin leaf on its books December 31, 1970, was $866,063.45.

In November 1970, Summers retained the E. J. Burke, Jr., Inc., Detective Agency (Burke) to investigate aspects of the loss. He gave Burke the information he had compiled.

Burke issued a report of its investigations to Scotten, Dillon on December 1, 1970. The investigator, John Cole, had interviewed Power, Buchen, and Tryggestad. In Cole's opinion, the loss of Wisconsin leaf was caused by internal theft and he inferred that Power, Buchen, and Tryggestad were the perpetrators.

On November 25, 1970, Summers contacted the sheriff of Vernon County, Wis., and the Federal Bureau of Investigation and advised them of the results of his investigations. The sheriff was unable to uncover any information with respect to the shipments from the Sparta-American warehouse to Viroqua. In December 1970, the sheriff told Summers that he had discussed the matter with the district attorney, and that they would not participate further in the investigation because they did not have sufficient facilities.

Scotten, Dillon and Wisco were insured by the Employers-Commercial Union Insurance Co. under a comprehensive dishonesty, disappearance, and destruction policy. Their maximum coverage for employee dishonesty was $500,000. Neither Scotten, Dillon or Wisco were otherwise insured against theft losses or mysterious disappearance of their property. Summers notified

the insurance company by letter on November 21, 1970, of the possibility of a loss to Scotten, Dillon covered by the policy. The letter states in pertinent part:

As a result of a recent audit and inventory we have reason to believe that there will be a fidelity loss under the * * * policy.

Although we have not, as yet, been able to identify any specific employees, the amount of shortage is so substantial as to indicate that it could not have occurred thru *[sic]* normal means of attrition.

We are continuing our investigation in an effort to specifically * * * [determine] the causes of these shortages. We would appreciate your putting the Bonding Company on notice and would appreciate any assistance which they could give us in investigating the situation.

The insurance policy contained the following provisions, among others:

### EMPLOYEE DISHONESTY COVERAGE - FORM A

1. [The Insurance Company agrees to pay the insured for:] Loss of Money, Securities and other property which the Insured shall sustain, to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this Insuring Agreement I, through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.

\*       \*       \*       \*       \*       \*       \*

### EXCLUSIONS

Section 2. This policy does not apply

\*       \*       \*       \*       \*       \*       \*

(b) * * * to loss, or that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation, provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees;

\*       \*       \*       \*       \*       \*       \*

### LOSS CAUSED BY UNIDENTIFIABLE EMPLOYEES

Section 4. If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees and the Insured shall be unable to designate the specific Employee or Employees causing such loss, the Insured shall nevertheless have the benefit of Insuring Agreement I, subject to the provisions of Section 2(b) of this Policy, provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, and provided, further, that the aggregate

liability of the Company for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement I.

The policy also required that Scotten, Dillon notify Employers-Commercial of the loss as soon as practicable after its discovery and to file a proof of loss within 4 months after discovery of the loss.

After receiving Scotten, Dillon's letter, Employers-Commercial engaged the certified public accounting firm of Buchanan, Retzlaff, Worchel & Co., LaCrosse, Wis., to review Wisco's inventory records. On December 29, 1970, the accounting firm issued a report of its review by letter to Employers-Commercial. This report indicated that the inventory shortage had originated at the Sparta-American warehouse.

In the first week of December 1970, Scotten, Dillon received financial reports on Power, Buchen, and Tryggestad from Dun & Bradstreet. No adverse financial information was contained in any of the reports, and no outstanding suits, liens, or judgments were found against either of the three. After receiving these financial reports, Summers had further investigations performed in 1971 regarding the solvency of Power, Buchen, and Tryggestad.

On December 9, 1970, the board of directors of Scotten, Dillon held a meeting at which the following occurred:

Mr. Summers then reviewed the Wisconsin Tobacco inventory shortage and the present operation of Wisconsin. Mr. Summers also stated that certain records of Wisconsin have disappeared, and that Messrs. Power, Buchen and Tryggestad had refused to take a polygraph examination, and in his opinion were not fully cooperative.

*   *   *   *   *   *   *

Mr. Berg stated that he was disturbed that the principal officers of Wisconsin (i.e. Messrs. Power and Buchen) had not themselves reported the inventory shortage or loss to management or directors of the Company, but had permitted Wisconsin to operate in a manner and fashion that had enabled the loss to occur and remain undetected and, as a consequence had been remiss in their duties and shown themselves to be inefficient and untrustworthy, to the detriment of the Company and its stockholders. Under the circumstances and taking into account the agreement dated June 30, 1967 by and between Scotten, Dillon Company and Messrs. Power and Buchen, Mr. Berg suggested that the Board take action to: (a) terminate Messrs. Power and Buchen as officers and employees of Wisconsin, (b) terminate the employment contracts by and between Mr. Power and the Company and Mr. Buchen and Wisconsin, (c) cancel the 5,600 shares of stock issued to and in the name of Messrs. Power and Buchen pursuant to the June 30, 1967 Agreement and the July 18, 1967

Indemnity Agreement, and return these shares to the Treasury, and (d) have the Company, as the sole stockholder of Wisconsin, take action to constitute a new board of directors of Wisconsin and take such further action as may be necessary and appropriate.

*     *     *     *     *     *     *

RESOLVED, that the issuance and transfer from treasury shares of (i) 5,000 shares of common stock of the Company to Ralph R. Power and (ii) 600 shares of common stock of the Company to James E. Buchen be, and it hereby is, declared by this Board of Directors to be void as of the effective date of such transfer, namely July 18, 1967, and the proper officers of the Company be, and they hereby are, and each of them hereby is, authorized, empowered and directed to forthwith proceed with such action and do such things as they and each of them deem necessary or desirable under the premises to effect registration on the books of the Company transfer of the 5,600 shares of common stock of the Company represented by certificates DO 14483 and DO 14484 to the name of the Company.

FURTHER RESOLVED, that upon the registration of transfer of the 5,600 shares of common stock as aforesaid, such shares be, and they hereby are, restored to the status of treasury shares to be carried on the books and records of the Company at such value as reflected by the last sale price per share on the Detroit Stock Exchange for December 9, 1970.

*     *     *     *     *     *     *

RESOLVED, that Mr. Ralph R. Power and Mr. James E. Buchen be and they hereby are removed as officers of Wisconsin Tobacco Company, Inc. and/or Scotten, Dillon Company.

FURTHER RESOLVED, that it is in the best interests of the Company to terminate as of December 9, 1970 the employment contracts of Ralph R. Power and James E. Buchen, and the employment contracts be, and they hereby are, in all respects, deemed terminated and the appropriate officers of the Company be, and they hereby are directed not to make any payments thereunder.

In late December 1970, Summers instructed David I. Perle, acting plant manager of Wisco, to conduct the annual physical inventory of all tobaccos at the Viroqua warehouses. Perle and two persons from Price Waterhouse conducted the inventory on December 30, 1970. Summers instructed Perle to count the tobacco at the three warehouse locations in Viroqua and one at Westby which had been inventoried on October 31, 1970. The warehouses were limited by Summers on the basis of Buchen and Tryggestad's information that no tobacco was stored at any other warehouses. Summers had also requested Burke to check for Wisconsin leaf in warehouses within a 150-mile radius of Viroqua in which Scotten, Dillon had stored tobacco. Burke's investigation verified Buchen and Tryggestad's information. The warehouseman also confirmed this information.

Perle's inventory indicated that 49,805 pounds (approximately

1,158 bales) of Wisconsin leaf was stored at these warehouses. Although it was possible to ascertain visually the various types of tobaccos, ownership of the various units was not marked on the units themselves. On Summers' instructions, this small amount of Wisconsin leaf was allocated to Wisco because it was much less than the normal operating supply maintained by Wisco.

The inventory also showed shortages in the amounts of Florida leaf tobacco, Pennsylvania leaf, and wrapper cuttings actually on hand as compared to the amounts that should have been present per books.

On the consolidated return filed by petitioners for the taxable year 1970, a deduction was taken for cost of goods sold in the amount of $6,876,239, computed as follows:

*Cost of goods sold*

| | |
|---|---:|
| Scotten, Dillon | $3,642,226 |
| Wisco | 1,834,954 |
| United Tobacco Suppliers | 165,149 |
| Food Packaging, Inc. | 2,574,128 |
| | 8,216,457 |
| | |
| Less: Intercompany eliminations | 1,339,858 |
| Less: Error in transposing cost of goods sold to page 2, line 7 of Form 1123 | 360 |
| Cost of goods sold per return | 6,876,239 |

In computing its cost of goods sold, Scotten, Dillon reduced its ending inventory of Wisconsin leaf tobacco in the amount of $950,889.71. The reduction was comprised of the following:

| Type | | Amount |
|---|---:|---:|
| Wisconsin leaf | | $866,063.45 |
| Pennsylvania leaf tobacco | $32,551.18 | |
| Florida leaf tobacco | 33,075.08 | |
| Wrapper cuttings | 19,200.00 | |
| | | 84,826.26 |
| | | 950,889.71 |

Petitioners have conceded that $45,748.71 of the $84,826.26 represented by the Pennsylvania leaf tobacco, the Florida leaf tobacco, and the wrapper cuttings amounts should not have been charged to Scotten, Dillon's cost of goods sold. Petitioners

contend that this amount should be charged to Wisco's cost of goods sold for 1970.

In January 1971, Summers hired Execudec, Inc., to investigate the inventory shortage. Execudec's investigation continued into late 1971 or 1972.

On February 24, 1971, Scotten, Dillon filed a proof of loss under its insurance policy with Employers-Commercial, alleging a loss of 43,855 bales of Wisconsin leaf tobacco having a fair market value of $934,000 due to the dishonesty of Power, Buchen, and Tryggestad. The proof of loss was based solely on the loss of Wisconsin leaf; no other tobacco was included in the 43,855 bales. The proof of loss stated in relevant portion:

3. The facts and circumstances giving rise to this proof of loss and the related dishonesty of conspirators are as follows:

(a) The defalcation could not have occurred without the knowledge, cooperation and consent of conspirators owing to

(i) The magnitude of the physical volume and weight of the 43,855 bales diverted. The weight is in excess of 1,340,000 pounds and it is estimated that it would take fifty 40 ft. semi-trailer loads to transport this quantity of tobacco, requiring over 400 man-hours, (10 employees x 8 hours x 5 days) to load such tobacco on semitrailers. Claimants do not own, lease or operate trucks of such capacity. The activity inherent in movement of tobacco of this magnitude could not have taken place without the direct knowledge and consent of conspirators.

(ii) Tryggestad and employees under his direct supervision and control, made monthly physical inspections and verification of contents of each warehouse. Such persons have disclaimed having observed evidence of any forcible entry and have stated that any unauthorized entry and theft of this magnitude could not have happened without their knowledge—although at no time did they report any unauthorized entry or theft of leaf tobacco to their superiors or claimants. In the course of investigations made to determine the nature of the loss, Tryggestad was unable to explain his apparent lack of knowledge of the theft, except that he admitted that he had "done a poor job."

(iii) By June 1970 the Wisconsin leaf tobacco inventory had diminished to levels that threatened curtailment of production, yet the conspirators withheld from claimants these circumstances. Claimants first received indications of acute inventory levels from representatives of Lancaster Leaf Tobacco Company (a prospective purchase [sic] of Wisconsin leaf tobacco), which reported to Scotten in September 1970 that they believed there was a patent discrepancy between quantities Scotten had agreed to sell to Lancaster and physical quantities they observed to be actually on hand. When confronted with such unverified discrepancy, Buchen attempted to mitigate its effect by informing Scotten in September that considerable quantities of leaf tobacco were being stored in warehouses not owned by Wisco, namely at storage facilities of Northern Wisconsin Cooperative Tobacco Company, located in Viroqua, Wisconsin. Buchen stated subsequently in November 1970 that he had

been "misunderstood" by Scotten officers with respect to inventories stored at this location.

(iv) At all times the conspirators had complete knowledge of the quantities of tobacco inventory under the direct and active supervision and control of Wisco. Annex B is a copy of a schedule prepared by Wisco under the direction and supervision of the conspirators setting forth an analysis of the aggregate of all tobacco inventories purportedly stored for Scotten's account through September 1970. The schedule shows the amount of tobacco on hand as of October 31, 1969 (the date of the prior audited physical inventory) and amounts sold to third parties for Scotten's account or transferred to Wisco's inventories in connection with the intermediate processing of tobacco for Scotten, or for sale by Wisco to third parties, leaving a balance on hand at the end of September 1970 of 2,258,798 pounds. Wisco's production records for the month of October reports usage of approximately 149,000 pounds, and the balance on hand at October 31, 1970 (based on the audited physical inventory) was approximately 269,000. It is obvious that persons knowledgeable in tobacco inventory control had to recognize there was substantial discrepancy of over 1,800,000 pounds of tobacco between the physical quantities on hand and records they maintained.

Mr. John Strickler of Lancaster Leaf Tobacco Company was in Wisco's Viroqua location in *June 1970* in connection with the examination of tobacco for possible purchase and he estimates that there was [sic] between 500,000 and 750,000 pounds of tobacco stored in the New Warehouse in Viroqua at that time. By the conspirators own admission that was the only location where at that time any significant amounts of tobacco was [sic] stored; the Sparta-American Warehouse having been closed in April 1970. Yet none of the conspirators reported this substantial discrepancy to anyone, but have steadfastly disclaimed knowledge of such discrepancy. In fact Wisco's monthly report of insurable values of inventories as of September 30, 1970 (Annex C), prepared by Wisco's bookkeeper and subscribed by Buchen, discloses that Buchen had reported $1,121,656 value of Wisconsin leaf tobacco at that date, which reconciled to October 31, 1970 discloses a shortage of approximately $938,000 from the value of the inventory actually on hand at that date. Despite the substantial discrepancies between amounts actually on hand and (i) perpetual records maintained by Wisco (i.e. Annex B), (ii) current insurance reports (Annex C), (iii) quantity of inventories observed to be on hand in June and September by Lancaster Leaf Tobacco Company, and despite monthly inspection and verification procedures purportedly observed by Tryggestad, the conspirators did not attempt at any time to reconcile such differences or explain the occurrence thereof. Buchen and Tryggestad had direct knowledge and control of all tobacco leaf inventories of Wisco and Scotten. Annex D hereto is a copy of working papers of Scotten's independent accountants supporting the audited inventory as of October 31, 1969 showing that Buchen and Tryggestad had supervised the physical inventory and that the inventories of both Scotten and Wisco were comingled [sic].

(b) The conspirators destroyed, secreted or caused to be withheld from claimants records of Wisco, prepared and maintained consistant [sic] with established inventory control procedures and practices, for the purpose of (i) hindering or frustrating investigations of claimants and law enforcement

agencies and (ii) to conceal the circumstances surrounding the disappearance of tobacco inventories. For example, conspirators stated that all inventory stored at the Sparta-American warehouse remaining after sales made in March 1970 to third parties were moved by Wisco trucks to Viroqua in April 1970 but they were unable to verify the quantities transported to accomplish such move and they claimed no records were maintained or available to document the quantities of tobacco actually moved. Subsequent investigations disclosed, however, that (i) a schedule of actual time expended by employees in the move was prepared (Annex E), (ii) load slips were required to be submitted by truck drivers to Tryggestad, documenting the number of bales transported in each load, the preparation of which was confirmed by Gregory Haverson, a Wisco truck driver, (iii) Wisco had forms printed and available to record such movements in the form of Annex F, and (iv) records of inventory movements to and from warehouses had been shown an officer of Scotten approximately six months prior to investigations but such records were no longer available for examination after discovery of the loss.

(c) A reconstruction of the movement of tobacco inventories from the Sparta-American Warehouse in April 1970 from available information indicates that a substantial amount of inventory stored at such location was not moved to Viroqua as the conspirators contend. At December 31, 1969 unaudited records of Wisco show that 54,682 bales of Wisconsin leaf tobacco were stored at the Sparta-American Warehouse (Annex G). Such amount was verified by observations of Richard Lantz in February 1970 during his inspection of tobacco on behalf of Lorillard Tobacco Company precursory to delivery of tobacco to Lorillard. An aggregate of 18,797 bales were [sic] shipped in February and March 1970 pursuant to sales made to third parties, (Annex H), leaving a balance of 34,885 bales per inventory records maintained by Wisco. The analysis set forth in Annex I indicates that no more than 13,500 bales could have been moved to Viroqua from the Sparta-American Warehouse, leaving at least 21,385 bales unaccounted for. Yet persons responsible for and supervising the movement claim that the entire contents of the warehouse were emptied. Monthly insurance reports of the value of inventories stored at each location support the contention that the contents of the Sparta-American Warehouse were removed to other locations in April 1970 (compare Annex J [insurance report as of March 1970] with Annex K [insurance report as of April 1970] prepared by the Wisco bookkeeper and subscribed by Buchen.) Analysis of such reports indicates that there was an unexplained loss of insurance values for Wisconsin leaf tobacco in the month of April 1970 of approximately $160,000 (see Annex L).

(d) At no time prior to the discovery of the defalcation by Scotten in conjunction with the physical inventory taken on October 31, 1970, did the conspirators report any loss to complainants, and after such discovery they disclaimed knowledge of information that would indicate any discrepancy between inventories on hand and inventory records.

(e) After discovery of the defalcation, the conspirators refused to give any explanation of the loss, except that Power,* after reviewing all of the data developed by claimants and the results of the October 31, 1970 physical inventory, did confirm to claimants in November 1970 that (i) a substantial loss of inventory had occurred since the prior physical inventory as of October 31, 1969 but, (ii) in his view, "outsiders" were responsible for the loss, although he was unable to explain how a loss of such magnitude could have happened without the knowledge of "insiders."

(f) During the investigative process the conspirators especially Buchen and Tryggestad—refused to cooperate with official [sic] and agents of Scotten in determining the circumstances surrounding the loss; and each conspirator refused to submit to polygraph tests.

Notwithstanding the submission of the proof of loss, Summers continued his investigations.

Price Waterhouse prepared on March 5, 1971, a financial statement for Scotten, Dillon for the taxable year ending December 31, 1970. It stated in part:

The following uncertainties exist with respect to the accompanying financial statements:

\* \* \* \* \* \* \*

During 1970 [Scotten, Dillon] * * * experienced an unusual and significant inventory loss of tobacco as described in Note 3. Although not precisely determinable, based upon tests of inventory, production and other accounting records, management believes that approximately $936,000 of such shortage was attributable to other than normal production usage, and has reflected such amount less related tax benefits of $432,000, as an extraordinary item in the accompanying statement of income in the net amount of $504,000. Since it is not possible at this time to estimate the amount, if any, which the Company might ultimately recover from insurance and other sources, no allowance for such possible recovery has been made.

\* \* \* \* \* \* \*

3. *Inventories*

\* \* \* \* \* \* \*

During November 1970 [Scotten, Dillon] * * * discovered a significant inventory shortage of approximately $985,000. Based upon extensive tests of inventory, production, and other accounting records, management believes that the major portion of such shortage was attributable to other than normal production usage and has estimated such amount at $936,000. Management has reflected this amount as an extraordinary item of expense, less related tax benefits of $432,000 in the accompanying consolidated statement of income. Since investigations by [Scotten, Dillon], governmental, and outside agencies

---

* Investigations by claimants reveal that Power left the employment of Viroqua Leaf Tobacco Company, a subsidiary of Lancaster Leaf Tobacco Company, after Viroqua Leaf experienced an inventory shortage of tobacco in the vicinity of 500,000 to 750,000 pounds. Subsequent to this termination Power founded Wisco, which he and Buchen sold to Scotten in 1967.

have not progressed to the stage where [Scotten, Dillon] * * * can estimate the amount, if any, it can reasonably expect to recover from insurance or other sources, no allowance for such possible recovery has been made. The amount of insurance carried by [Scotten, Dillon] * * * which may be applicable to this matter is $500,000.

The 1970 annual report which Scotten, Dillon issued to its stockholders stated:

Unfortunately, during the year we discovered an inventory shortage at our Viroqua, Wisconsin location amounting to in excess of $936,000 which we feel could not have been attributable to current operations. We have notified applicable law enforcement and insurance agencies in an attempt to specifically identify the cause of the shortage. We are continuing our investigation of the situation and are hopeful of recovering all or some portion of the loss. Pending the discovery, if any, of some avenue of recovery, we have charged $504,000, net of recovery of applicable federal income taxes, to extraordinary charges.

In December 1970, Buchen and Tryggestad filed suit against Perle and Wisco for defamation.

On September 1, 1971, Scotten, Dillon filed a complaint against Power, Buchen, and Tryggestad for an accounting and damages due to the conversion of the Wisconsin leaf in the United States District Court for the Western District of Wisconsin. On September 9, 1971, Employers-Commercial informed Scotten, Dillon that it would not honor the claim made under the policy. On March 24, 1972, Scotten, Dillon commenced an action in the New York State Supreme Court, County of Erie, against Employers-Commercial seeking $500,000 in accordance with the terms of the policy. Summers, who participated in the commencement of these actions, believed that both were bona fide complaints.

On January 25, 1974, Scotten, Dillon filed a complaint in the Circuit Court of Vernon County, Wis., against Price Waterhouse for negligence in its December 31, 1969, audit and for breach of warranty. This lawsuit was commenced in order to toll the statute of limitations and in order to preserve Scotten, Dillon's rights in the event pending litigation revealed substandard performance by Price Waterhouse.[2]

---

[2]Petitioners objected to the introduction of any evidence of any events that occurred after Dec. 31, 1970, on the theory that a determination of whether there was a reasonable prospect of recovery on any of petitioners' possible claims should be made in the light of known facts as of that date. We received evidence with respect to events which actually occurred after Dec. 31, 1970, but which we believed could have been anticipated as of that date. We have recited those events above but have refused to accept evidence with respect to the ultimate disposition of those claims.

In the notice of deficiency for the taxable year 1970 respondent disallowed $934,000 of the $950,889.71 reduction in Scotten, Dillon's ending inventory because of the "absence of adequate inventory records."[3]

## OPINION

On the consolidated return filed by petitioners and others for the taxable year 1970, a deduction was taken for cost of goods sold in the amount of $6,876,239. In computing its cost of goods sold, Scotten, Dillon reduced its ending inventory of Wisconsin leaf tobacco in the amount of $950,889.71. This downward adjustment in the Wisconsin leaf account was represented by the following types of tobacco and amounts:[4]

| Type | | Amount |
|---|---|---|
| Wisconsin leaf | | $866,063.45 |
| Pennsylvania leaf | $32,551.18 | |
| Florida leaf | 33,075.08 | |
| Wrapper cuttings | 19,200.00 | 84,826.26 |
| | | 950,889.71 |

The notice of deficiency for the taxable year 1970 disallowed $934,000 of the reduction because of the absence of adequate inventory records. At trial and on brief, respondent argued that petitioners failed to prove that the loss of tobacco actually occurred in 1970, and also that as of December 31, 1970, petitioners had a reasonable prospect of recovering any loss actually suffered.

The focal point in this case naturally involves the $866,063.45 adjustment to the Wisconsin leaf account. Respondent does not dispute the amounts of opening inventory and purchases of Wisconsin leaf tobacco for the taxable year 1970. And, evidently, he does not contest the amount of the adjustment to the Wisconsin leaf account ($866,063.45, which left a closing inventory in this account of zero) if Scotten, Dillon establishes that it actually sustained a loss of Wisconsin leaf during 1970

---

[3] The $934,000 figure was obviously taken from the amount stated in the proof of loss filed by Scotten, Dillon with its insurance carrier.

[4] Why the downward adjustment to Scotten, Dillon's Wisconsin leaf account on the 1970 return also included these other types of tobacco is not explained by petitioners.

and that it was entitled to reduce its closing inventory of Wisconsin leaf to reflect the inventory loss in 1970.

While we harbor some doubts as to just what respondent meant by the phrase "absence of adequate inventory records" used in the notice of deficiency, respondent has pointed to no inadequacy of inventory records with respect to the Wisconsin leaf account that would warrant disallowance of the adjustment to cost of goods sold in that account for that reason alone. Petitioners' records included the results of the physical inventories taken as of October 31, 1969, October 31, 1970, and December 31, 1970. The question is whether Scotten, Dillon actually suffered an unaccounted for shortage in its inventory of Wisconsin leaf in 1970.

Petitioners argue that, because of the discrepancy in the reason given by respondent for the disallowance in the notice of deficiency and the reason stated at trial, respondent has the burden of proving that petitioners did not suffer an actual shortage in their inventory. We do not agree with petitioners on this point, see *Helvering v. Gowran*, 302 U.S. 238 (1937); *Mayerson v. Commissioner*, 47 T.C. 340, 349 (1966), but we need not answer this evidentiary question because we find from the evidence presented by the parties adequate proof that petitioners did suffer a shortage in their inventory of Wisconsin leaf in 1970.

However, the adequacy of inventory records with regard to the reduction in closing inventories of the Pennsylvania leaf, Florida leaf, and wrapper cuttings accounts is an issue and for the sake of simplicity we will discuss that issue first.

Respondent contends that petitioners have failed to establish through testimony, inventory records, or other documentary evidence that either Scotten, Dillon or Wisco is entitled to a downward adjustment of their ending inventories of these types of tobacco or in these amounts. As indicated above, petitioners reduced their closing inventories in these three accounts by a total of $84,826.26, but in the stipulation of facts conceded that $45,748.71 of that amount should not have been charged to Scotten, Dillon's cost of goods sold, but should have been charged to Wisco. We have no explanation of why this concession was made; nor do we have any evidence of how much Pennsylvania leaf, Florida leaf, and wrapper cuttings were actually on hand at either the beginning of 1970 or on December

31, 1970. Exhibit 17–Y, evidently prepared by Richard Gross of Price Waterhouse, from the physical inventory as of October 31, 1969, does show Scotten, Dillon inventories of Florida leaf of 847 bales with a value of $33,439.56 and of wrapper cuttings of 228 cartons with a value of $19,152, but reflects nothing with respect to Pennsylvania leaf. Whether purchases or sales of these three types of tobacco were made in November and December 1969 is not revealed by the record; hence Scotten, Dillon's opening inventories in these accounts for 1970 is not in evidence. Furthermore, we have no evidence of the purchase or sales of these tobaccos in 1970. The workpapers prepared by Perle tabulating the results of the physical inventory as of December 31, 1970, and incorporating the Scotten, Dillon book amounts, do not reflect the figures used by petitioners on the 1970 return as reductions in inventories.

The evidentiary gaps with regard to these portions of the reductions in Scotten, Dillon's closing inventories are too substantial to sustain a finding that petitioners have proved by adequate inventory records that the reductions are justified. And there is a complete absence of proof with regard to petitioners' proposed reallocation of the reductions. Consequently, to the extent that respondent's disallowance relates to the reductions in closing inventories of these three types of tobacco, it is upheld.

With respect to Scotten, Dillon's $866,063.45 reduction in its 1970 ending inventory of Wisconsin leaf, respondent asserts a two-pronged challenge; first, that petitioners failed to prove that they actually sustained a loss of Wisconsin leaf during 1970, and, second, that even if the loss is proven, it is not deductible under sections 165(a) and 165(e), I.R.C. 1954,[5] because there existed as of December 31, 1970, claims for reimbursement with respect to which there was a reasonable prospect of recovery. Secs. 1.165–1(d)(2)(i) and 1.165–8(a)(2), Income Tax Regs.

Respondent's principal argument that an actual loss was not proven hinges on petitioners' failure to take a physical inventory as of December 31, 1970, of all 10 of the warehouses in which such tobacco had been stored at one time or another, particularly the Lexington warehouse. We find this argument to be specious

---

[5] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

in light of the evidence. The evidence is that Summers directed Perle to take physical inventories as of December 31, 1970, at three of the warehouses in Viroqua and one in Westby where he had been advised by Buchen and Tryggestad, who were in charge of the warehouses for Wisco, that all the Wisconsin leaf tobacco was stored at that time. This appeared to be reasonable advice since Wisco had engaged in concentrating all of this tobacco in the Viroqua area since the spring of 1970, and Summers had good reason to believe that only burley tobacco had been and was stored in Lexington. In addition, however, Summers instructed Perle to make a check of all tobacco warehouses within a 150-mile radius of Viroqua for Wisconsin leaf tobacco. This Perle did and the result was a confirmation of the advice received from Buchen and Tryggestad. Perle thereupon took a physical inventory of the tobacco in the Viroqua and Westby warehouses, the results of which are reflected in our findings and which support petitioners' claim that 43,855 bales of Wisconsin leaf were missing. While it is true that there was no physical inventory of the Lexington warehouse, there is nothing in the record to suggest that any Wisconsin leaf was ever stored in that warehouse. In light of the strenuous efforts then being made by Summers, the officer in charge of the investigation for this publicly held corporation, to discover the whereabouts of the missing tobacco, we feel justified in concluding that the 43,855 bales of Wisconsin leaf were missing.

We see no need to rehash the facts which we have set forth in our findings of fact that prove to our satisfaction that a shortage of the tobacco inventory occurred in 1970. Those facts are based on all the evidence, and we believe it is abundantly clear from a review of those facts that there was a loss of tobacco inventory in 1970. There was a physical inventory taken as of October 31, 1969, by independent accountants which was in close agreement with the inventory shown on the books. It is stipulated that no Wisconsin Leaf was purchased between October 31 and December 31, 1969, and there is no reason to believe that sales of this tobacco during those 2 months were not correctly recorded on the inventory records. We can therefore assume that the inventory per books correctly reflected the opening inventory of this tobacco as of January 1, 1970—in fact, respondent does not dispute this. It is also stipulated that no

Wisconsin leaf was purchased by Scotten, Dillon during 1970, and no question has been raised about the proper charges to the inventory account on the books for 1970 for sales and transfers. When the physical inventory taken as of October 31, 1970, revealed that there were only 8,648 bales of tobacco on hand instead of the more than 50,000 bales indicated on the books, and when this finding was supported by the physical inventory taken as of December 31, 1970, it became, and is, readily apparent that over 43,000 bales of Wisconsin leaf tobacco had unaccountably been removed from the inventory during 1970. We so conclude. If respondent's argument is that there was no proof as of December 31, 1970, that the tobacco was stolen, and therefore there was no proof of a casualty loss in 1970, the answer is that theft losses are normally deductible in the year of discovery (sec. 165(e)), and petitioners are not claiming a casualty loss but a business loss, which is effected through a reduction of their closing inventory.

The second prong of respondent's challenge is that the loss is not allowable in 1970 because as of December 31, 1970, there existed claims for reimbursement of the loss with respect to which there was a reasonable prospect of recovery. This argument is based on sections 1.165–1(d)(2)(i) and 1.165–8(a)(2), Income Tax Regs., and cases applying section 165 of the Code. See *Ramsay Scarlett & Co. v. Commissioner*, 61 T.C. 795 (1974), affd. 521 F.2d 786 (4th Cir. 1975); *Montgomery v. Commissioner*, 65 T.C. 511 (1975).

Section 165 of the Code allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 1.165–1(b), Income Tax Regs., provides that to be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events. See also *Montgomery v. Commissioner, supra; First Nat. Corp. v. Commissioner*, 147 F.2d 462 (9th Cir. 1945). Section 1.165–1(d)(2)(i), Income Tax Regs., provides in part:

If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question

of fact to be determined upon an examination of all facts and circumstances. * * *

Accordingly, whether Scotten, Dillon sustained a loss deductible in 1970 under section 165 depends on whether at the close of 1970 there existed a "claim for reimbursement with respect to which there [was] a reasonable prospect of recovery." As explained in *Ramsay Scarlett & Co. v. Commissioner, supra* at 811:

A reasonable prospect of recovery exists when the taxpayer has bona fide claims for recoupment from third parties or otherwise, and when there is a substantial possibility that such claims will be decided in his favor. * * * The standard for making this determination is an objective one, under which this Court must determine what was a "reasonable expectation" as of the close of the taxable year for which the deduction is claimed. * * * The situation is not to be viewed through the eyes of the "incorrigible optimist," and hence, claims for recovery whose potential for success are remote or nebulous will not demand a postponement of the deduction. * * * The standard is to be applied by foresight, and hence, we do not look at facts whose existence and production for use in later proceedings was not reasonably foreseeable as of the close of the particular year. * * *

Normally, the burden of establishing that no reasonable prospect of recovery exists lies with petitioners. *Hudock v. Commissioner,* 65 T.C. 351 (1975); *Gale v. Commissioner,* 41 T.C. 269 (1963). Petitioners argue, however, that because this particular ground for disallowance of the reduction in closing inventory was not raised in the notice of deficiency respondent bears the burden of proof on this issue. We doubt the validity of this contention. Rule 142(a), Tax Court Rules of Practice and Procedure, does shift the burden of proof to respondent with respect to any new matter raised by respondent in the answer or at trial. We doubt that this would be considered new matter because this is a ground for disallowing a loss under section 165 whether specifically mentioned or not. Furthermore, where a petitioner has not been surprised or prejudiced in an evidentiary sense by the introduction of a new ground of controversy, the usual rule that the burden of proof is upon petitioner remains in force. *J. T. Slocomb Co. v. Commissioner,* 334 F.2d 269 (2d Cir. 1964), affg. 38 T.C. 752 (1962); cf. *Mayerson v. Commissioner, supra.* In his opening statement at trial, petitioners' counsel stated that the "question in this case is whether the petitioner * * * had a reasonable prospect of recovering the shortage." Inasmuch as petitioners were aware prior to trial of this issue

and presented evidence germane to its resolution, we doubt that the rules mandate a shift of the burden of proof. But again we need not decide this evidentiary question because we believe the evidence in the record clearly demonstrates that there was a reasonable prospect of recovery of the loss as of December 31, 1970.

Petitioners would have us approach the standard of foresight as an impenetrable wall separating claims for recoupment actually made by December 31, 1970, from those claims made after December 31, 1970. And because no claims were presented until after the end of the taxable year, they contend that Scotten, Dillon has sustained an allowable loss. However, it is apparent that claims for reimbursement and other actions taken toward recoupment by the taxpayer after the close of the taxable year may be examined in order to determine if a substantial possibility of recoupment existed as of the close of the taxable year if at that time it was reasonably foreseeable that such claims and actions would occur.

With this legal frame of reference, we turn to the evidence pertinent to this issue. That a claim for recoupment with respect to which Scotten, Dillon had a substantial possibility of success existed as of December 30, 1970, is apparent from the record. We refer to the claim for $500,000 insurance coverage for employee dishonesty under the policy maintained by Scotten, Dillon with Employers-Commercial.

After ascertaining that there was a substantial shortage of Wisconsin leaf tobacco and investigating the records of the consolidation during 1970 of tobacco stored by Wisco at its Sparta-American warehouse to the Viroqua warehouses, Scotten, Dillon informed Employers-Commercial by letter on November 21, 1970, of the possibility of a loss covered under the insurance policy. The letter further stated that Scotten, Dillon was unable at that time to identify specific employees responsible for the loss. Although prompt notification of the loss was required after discovery of the loss by the terms of the policy, it is clear that Scotten, Dillon did not consider this notification pro forma. Its suspicions were aroused regarding the criminal culpability of Power, Buchen, and Tryggestad.[6] Scotten, Dillon

---

[6] It is also apparent from the minutes of the meeting of Scotten, Dillon's board of directors on Dec. 9, 1970, that Buchen and Power were believed to have been negligent and derelict in their responsibilities.

retained the Burke Detective Agency to investigate the shortage. Burke's report of December 1, 1970, opined that the shortage was due to internal theft and inferred that the theft had been perpetrated by Power, Buchen, and Tryggestad. Scotten, Dillon also requested Burke to check all warehouse locations maintained by Wisco within a 150-mile radius of Viroqua for Wisconsin leaf tobacco even though Burke and Tryggestad had informed Summers that the Wisconsin leaf inventory was all stored at the warehouses in Viroqua and one in Westby. Scotten, Dillon also ordered financial investigations of the three men by Dun & Bradstreet. Clearly, as of December 30, 1970, Scotten, Dillon had reason to believe that the three men had misappropriated the tobacco, and Scotten, Dillon intended to file a proof of loss with Employers-Commercial as a result. The proof of loss filed in February 1971 sets forth in some detail why Scotten, Dillon believed the three men had stolen the tobacco. The relevant portions of the proof of loss have been set forth in our findings of fact and will not be repeated here.

Despite these circumstances, petitioners argue that they had no substantial possibility, as of December 31, 1970, of collecting on their insurance policy with Employers-Commercial. Scotten, Dillon, they contend, did not have any direct evidence that Buchen, Power, or Tryggestad actually misappropriated the tobacco; it merely possessed strong suspicions based on its inventory records and circumstantial evidence flowing from those records that one or all of the three men must have been criminally responsible for the shortage. This, petitioners contend, is insufficient under Wisconsin law to recover under the policy. They point to the provision in the policy which excludes from coverage any loss—

the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation * * * ; provided, however, that this paragraph shall not apply to loss of Money, Securities or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees.

This provision has been interpreted by the Supreme Court of Wisconsin as allowing the inventory computation to prove the amount of the loss once evidence independent of the inventory computation shows that employees stole or misappropriated the inventory. *Tri-Motors Sales, Inc. v. Travelers Indemnity Co.*, 19

Wis. 2d 99, 119 N.W.2d 327 (1963). While it is true that Scotten, Dillon did not have evidence such as a confession or admission by any of the three men, the proof of loss does set forth circumstances other than the inventory computation from which the complicity of Buchen, Power, and Tryggestad could be inferred. Buchen's untrue statement that considerable quantities of leaf tobacco were being stored at warehouses not owned by Wisco, the failure of Power, Buchen, or Tryggestad to inform Scotten, Dillon of the inventory shortage, the destruction or loss of the time cards and load slips relative to the transfer of Wisconsin leaf from the Sparta-American warehouse, and the estimate of the number of bales which could have been moved from that warehouse to Viroqua constitute circumstantial evidence independent of the inventory calculation. What we are concerned with here is not that every element necessary to succeed upon the claim for reimbursement be established as of the close of the taxable year. We are determining whether a substantial possibility of success existed as of December 31, 1970. Even though this evidence is not conclusive, it is not so weak that only an incorrigible optimist would believe recovery possible under the insurance claim.

Respondent further contends that two other avenues of recovery were reasonably foreseeable to Scotten, Dillon as of December 31, 1970, with respect to which success was a substantial possibility. He is referring to the lawsuits commenced against Power, Buchen, and Tryggestad on September 1, 1971, and against Price Waterhouse on January 25, 1974.

With respect to the latter action, we do not believe that its commencement was reasonably foreseeable as of the close of 1970. No indication that Price Waterhouse might have been negligent in conducting the inventory as of December 31, 1969, existed in 1970. Moreover, the lawsuit was commenced in order to toll the statute of limitations and to protect Scotten, Dillon's rights in the event negligence was revealed.

However, the lawsuit for damages and an accounting commenced against Power, Buchen, and Tryggestad on September 1, 1971, is in a different category. As noted, Scotten, Dillon believed in 1970 that the three men were criminally or negligently responsible for the inventory shortage and had begun to investigate their financial positions. The maximum insurance recovery was considerably less than the value of the

missing tobacco. Thus, it was reasonably foreseeable as of the close of 1970 that Scotten, Dillon would continue its investigations and would institute civil litigation against them. Moreover, the chances of recovery from the three men were not remote or nebulous. The men were responsible for Wisco's operations and they were not judgment proof.

Furthermore, we believe it is highly unlikely that Summers would have spent the time and money investigating the loss and trying to determine who was responsible therefor, which continued into 1971, unless he thought there was a reasonable expectation of recovery. The confirmation of the loss simply occurred too late in the year 1970 to complete the investigation and determine what claims to file before the end of 1970. But certainly as of that date, with the avenues for recovery that were available, there was a substantial possibility of success. Summers was not asked whether he thought there was a reasonable prospect of recovery as of December 31, 1970, but he did testify that the lawsuits subsequently filed seeking recovery were not frivolous.

Accordingly, we conclude that Scotten, Dillon had reasonable prospects of recovery on its claims for reimbursement for the missing tobacco at the end of 1970.

In respondent's view, the above conclusion should require entry of decision for respondent. However, petitioners present the novel argument that the reasonable prospect of recovery test for disallowance of a loss under sections 165(a) and 165(e) in the year of discovery has no application to their right to reduce Scotten, Dillon's ending inventory for 1970 to reflect the actual loss of tobacco during that year.

Respondent did not discuss this issue in his opening brief and claims that petitioners should not be entitled to rely on it because they first raised the issue on brief. We disagree. Without going into the details of the pleadings and pretrial proceedings which support our conclusion, we point to the opening statement of petitioners' counsel wherein he recognized that the principal factual issue to be decided was whether petitioners had a reasonable prospect of recovering the shortage as of December 31, 1970, but also stated (Tr. 12):

I should also say that we are doubtful as a matter of law whether the reasonable prospect rule applies to an inventory shortage because of the way in

which the regulations read. We don't intend to belabor that point here, but we do intend to cover it on brief. * * *

At one point or another, both parties claim that the other is relying on issues that were not raised in the notice of deficiency or the pleadings, but we believe counsel for both parties were aware of all the issues that would be argued before the trial began and that respondent was not "surprised" when petitioners argued this legal issue at length in their opening brief.

The basis for petitioners' contention is sections 1.165–7(a)(4) and 1.165–8(e), Income Tax Regs., which state that sections 165(a) and 165(e) do not apply to casualty and theft losses reflected in the inventories of the taxpayer.[7] In such a situation, cross reference is made to section 471 and the regulations thereunder.[8] It is petitioners' view of these regulations that section 471 controls the allowability of any reductions in ending inventory due to a loss or shortage of the inventory. Consequently, the possibility of an insurance recovery or other form of reimbursement for the inventory loss does not affect Scotten, Dillon's right to reduce its ending inventory to its actual level in computing its cost of goods sold for tax purposes for the taxable

---

[7]Sec. 1.165–7 [Income Tax Regs.] Casualty losses.

(a) *In general*—(1) *Allowance of deduction.* Except as otherwise provided in paragraphs (b)(4) and (c) of this section, any loss arising from * * * other casualty is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. * * *

*        *        *        *        *        *        *

(4) *Application to inventories.* This section does not apply to a casualty loss reflected in the inventories of the taxpayer. For provisions relating to inventories, see section 471 and the regulations thereunder.

Sec. 1.165–8 [Income Tax Regs.] Theft losses.

(e) *Application to inventories.* This section does not apply to a theft loss reflected in the inventories of the taxpayer. For provisions relating to inventories, see section 471 and the regulations thereunder.

[8]SEC. 471 [I.R.C. 1954]. GENERAL RULES FOR INVENTORIES.

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Sec. 1.471–11(c)(2) [Income Tax Regs.].

*Includability of certain indirect production costs* * * * [in inventories of manufacturers].

*        *        *        *        *        *        .*

(ii) *Costs not included in inventoriable costs.* Costs which are not required to be included for tax purposes in the computation of the amount of inventoriable costs (regardless of their treatment by a taxpayer in his financial reports) include:

*        *        *        *        *        *        *

(g) Losses under section 165 and the regulations thereunder, * * *

year in which the physical loss occurs and is discovered. Petitioners cite no other authority for their position.[9]

In his reply brief, respondent does make a passing reference to petitioners' argument on this issue, noting that petitioners rely on the regulations cited above. |Respondent argues that the purpose of these regulations is to prevent a double deduction. He alleges that under the regulations a taxpayer who has a loss in inventory within section 165 may claim the deduction either as a section 165 deduction or as part of the cost of goods sold; but until a section 165 loss is established, no deduction is allowable under either section 165 or through cost of goods sold. Neither does respondent cite authority for his position. Thus, we apparently must approach this issue firsthand.

Respondent does not dispute that a downward adjustment of inventory is the proper way to account for normal shortages in inventory caused by theft, deterioration, storm damage, etc. Indeed, we assume this method is used routinely by businesses which are required to keep and account for inventories for tax purposes, without consideration of whether there is a reasonable prospect for recovery. The regulations and commonsense require that book inventories be checked from time to time by physical inventories; and if the physical inventory reflects a lesser amount than the book inventory, the book inventory is adjusted downward to conform to the actual inventory. But respondent takes the position here, probably because of the magnitude of the inventory shortage, that the downward adjustment of inventory to conform to the physical inventory cannot be made if petitioners have a reasonable prospect of recovering the loss occasioned by the shortage as of the end of the year in which the shortage occurred and was discovered. Query, at what magnitude does the reasonable prospect of recovery test become applicable?

Respondent seems to recognize that in accounting for a theft of inventory, a taxpayer may either claim the loss occasioned by the shortage as a loss under section 165 or as a part of the cost of goods sold. Perhaps the taxpayer is afforded this option—it would usually make little difference in the computation of taxable income. But the majority of this Court held in the second

---

[9]See, however, *United States Cartridge Co. v. United States*, 284 U.S. 511, 518–521 (1932).

case involving a loss due to fictitious purchases by an employee in *B. C. Cook & Sons, Inc. v. Commissioner*, 65 T.C. 422 (1975), affd. 584 F.2d 53 (5th Cir. 1978), that an adjustment to cost of goods sold is a different animal from a deduction for a loss. In the first case, *B. C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516 (1972), this Court held that the loss first discovered in 1965 resulting from fictitious purchases made by an employee during prior years which had been reflected in petitioner's cost of goods sold in those prior years was deductible in full as a loss under section 165 in the year of discovery. Since several of the years in which the fictitious purchases had been made were barred by the statute of limitations, respondent relied on the mitigation provisions of sections 1311–1314 to assert deficiencies for the barred years by disallowing the increases in cost of goods sold in those years as a result of the fictitious purchases. In that proceeding, reported at 65 T.C. 422, this Court held that an overstatement of cost of goods sold is not a "deduction" within the meaning of section 1312(2), which authorizes the use of section 1311 where a "determination" for a later year "allows a deduction or credit which was erroneously allowed to the taxpayer for another taxable year," and consequently respondent could not lift the statute of limitations for the earlier years despite the fact that petitioner had been allowed a "deduction" under section 165 in 1965 for the same amounts that petitioner had increased its costs of goods sold for those prior years. The majority opinion pointed out that cost of goods sold is an "offset" employed in the computation of gross income, while itemized deductions, such as those allowed by section 165, are subtracted from gross income in arriving at taxable income.

Both of the *B. C. Cook & Sons, Inc.*, opinions and the regulations under section 165 recognize that there is a distinction between losses of inventory and other losses and that the proper way to account for inventory losses is through adjustments to cost of goods sold. So, is respondent justified in requiring that an inventory loss must meet the requirements for deductions of section 165 losses before the cost of goods sold can be adjusted for the loss in inventory in the year it occurs and is discovered? Respondent cites no authority for doing so and we perceive none.

The "reasonable prospect of recovery" test is prescribed in section 1.165–1(d)(2)(i) and (d)(3), Income Tax Regs., "for

purposes of section 165." But sections 1.165–7(a)(4) and 1.165–8(e), Income Tax Regs., make the usual rules inapplicable to casualty and theft losses reflected in inventories. This is understandable because casualty losses reflected in inventories are also reflected in an increase in cost of goods sold and thus a reduction of income, and the allowance of a casualty loss under section 165 would result in a double reduction of taxable income for the same casualty. So the regulations provide that adjustment of cost of goods sold is the proper way to account for casualty losses in inventories.[10] Furthermore, the regulations which establish the "reasonable prospect of recovery test" for casualty losses in general are specifically made inapplicable to casualty losses reflected in inventories. Consequently, we find no justification for applying that test to petitioners' inventory losses which occurred in and were discovered in 1970.

Respondent argues that it would be inconsistent to allow these inventory losses for a year at the end of which there was a reasonable prospect of recovery while other losses would be disallowed under similar circumstances. We disagree. This is simply recognition of the fact that use of inventories in computing gross income for both book and tax purposes is unique and warrants use of different rules to correctly reflect income. We believe the downward adjustment in petitioners' ending inventory for the year 1970 does correctly reflect petitioners' income for 1970.

From a practical viewpoint, the discovery of the shortage in their tobacco inventory as of the end of the year 1970 required petitioners to reduce their book inventory to conform with actual facts. While strictly speaking, the cost of the missing tobacco might not be said to be a cost of goods sold in 1970 because it was not sold, it was converted to someone else's use and petitioners had no prospects of recovering the actual tobacco itself. Thus, cost of the missing tobacco was a component in computing cost of goods sold under the inventory method of accounting and was a cost of doing business in 1970. The only thing petitioners had any prospect of recovering after 1970 was cash. While any cash recovered in subsequent years might be used to buy additional inventory, this was not a certainty as of

---

[10]See dissenting opinions of Judges Simpson and Quealy in our first *B. C. Cook & Sons, Inc. v. Commissioner*, 59 T.C. 516, 525–528 (1972).

December 31, 1970. So far as the tobacco inventory was concerned, the loss was a closed and completed transaction as of December 31, 1970.[11]

It also seems more appropriate from an accounting standpoint to adjust the closing inventory for 1970 to recognize the shortage. It would have been very misleading to anyone looking at Scotten, Dillon's balance sheet to have the inventories reported as having a value of over $800,000 when in fact there was no value in the inventory. And, unless the adjustment was made in the ending inventory for 1970, the fiction would be carried on into 1971 and possibly later years, because the opening inventory for 1971 would have to coincide with the closing inventory for 1970. According to respondent's theory, this misrepresentation would have to be carried on until petitioners either settled all their claims for reimbursement of the loss or abandoned them. Unlike the loss of personal possessions, the loss of inventories requires the immediate replacement of those inventories if the taxpayer is to continue in business. He cannot wait for reimbursement. We believe this reasoning, together with the avoidance of double deductions, may be the explanation of why respondent made the regulations under section 165 inapplicable to casualty losses of inventory: Respondent cites no other reason for disallowing the adjustment to cost of goods sold in 1970. Since petitioners will have to include the amount of any reimbursement in income for the year in which accrued or received as other income, we see no reason to deny petitioners the right to write off the cost of the misappropriated inventory in the year it was misappropriated.

We therefore conclude that petitioners were entitled to adjust their ending inventory of Wisconsin leaf tobacco downward in the amount of $866,063.45 for 1970 in computing their cost of goods sold for that year even though we have found that there existed as of December 31, 1970, a reasonable prospect that

---

[11]See concurring opinion of Judge Tannenwald in *B. C. Cook & Sons, Inc. v. Commissioner, supra* at 522, in which he points out that we were dealing with two different items, cash from sales and fictitious purchases which had been erroneously used as an offsetting item.

petitioners would be reimbursed for at least a part of the cost of the missing tobacco.[12]

*Decision will be entered under Rule 155.*

---

[12]This conclusion would seem to make our discussion and conclusion with respect to the reasonable prospects of recovery unnecessary and dictum. However, in light of the lack of direct precedent for our conclusion on this issue, and the fact that most of the evidence offered by the parties was relevant to whether there was a reasonable prospect of recovery, we believe it is better for us to state our views on that subject at this time.