JAMES D. AND CONSTANCE J. GORMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gorman v. Commissioner
Docket No. 25081-92
United States Tax Court
T.C. Memo 1995-268; 1995 Tax Ct. Memo LEXIS 267; 69 T.C.M. (CCH) 2924; June 15, 1995, Filed *267 Decision will be entered under Rule 155. For petitioners: Thomas A. Crawford, Jr.
For respondent: Donna P. Leone. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions
to tax
Year
Deficiency
Sec. 6653(a)
Sec. 6661
1985
$ 2,935
[1] $ 147
-0-  1987
65,017
[1] 3,251
$ 16,254
1988
14,454
723
3,614
All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All adjustment amounts, deposits, and expenses have been rounded to the nearest whole dollar. The deficiencies and additions to tax for 1985 and 1988 result from respondent's disallowance of a 1987 net operating loss that petitioners had carried back to 1985 and carried over to 1988. The deficiency and additions to tax for 1987 result from respondent's disallowance of petitioners' claimed pass-through losses from an S corporation, Hi View Lumber, Inc. (Hi View). [1] Respondent has amended her answer to raise *268 the duty of consistency as an alternative ground for including in Hi View's gross income all insurance proceeds attributable to inventory lost in a fire, and to seek an increased deficiency arising from $ 31,927 of unreported insurance proceeds attributable to other property lost in the fire. Some issues have been settled. The issues requiring decision are: (1) Whether Hi View received insurance proceeds in excess of the amount reported on its return for the fiscal year ended July 31, 1987, and the amount of Hi View's adjusted basis in property that was lost in the fire; (2) whether Hi View had gross receipts in excess of the amount reported on its return for the fiscal year ended July 31, 1987; (3) *269 whether Hi View overstated its gross receipts on its return for the 5-month period ended December 31, 1987; and (4) whether petitioners are liable for additions to tax under section 6653(a) for 1985, 1987, and 1988 and under section 6661 for 1987 and 1988. We find that Hi View's adjusted basis in the property in issue was approximately equal to the amounts reported on its Form 1120S filed for the fiscal year ended July 31, 1987, making it unnecessary to address respondent's duty-of-consistency argument, and that, as asserted in respondent's amended answer, Hi View received $ 31,927 more in insurance proceeds than was reported on that return. We find that Hi View had $ 9,801 more in gross receipts than was reported on its return for the fiscal year ended July 31, 1987, and that it overstated its gross receipts for the 5-month period ended December 31, 1987, by $ 10,000. We find that petitioners are liable for additions to tax under sections 6653(a) and 6661 for the respective years in issue. FINDINGS OF FACT The parties have stipulated some of the facts, and the Stipulation of Facts, the Supplemental Stipulation of Facts, and all exhibits referred to in those stipulations are *270 incorporated in this opinion. Petitioners resided in McDonald, Pennsylvania, when they filed their petition. At all relevant times, James Gorman (petitioner) was president and sole shareholder of Hi View. During the years in issue, Hi View was petitioners' primary source of income, although petitioner also received disability payments of approximately $ 1,000 per month (whose taxability is not in issue) and interest income from bank accounts (which was properly reported on their return). Petitioners and their son were the sole employees of Hi View. Although petitioners received no salaries or distributions from Hi View during the period August 1, 1981, through December 31, 1987, they had accumulated at least $ 50,000 of cash, which they kept in a safety deposit box at their bank. Petitioners' son was paid approximately $ 10,000 per year during 1986 and 1987. Hi View was incorporated in 1960 as the successor of a business that petitioner had owned and operated since the 1950s. Hi View operated a lumber yard and general store, located at McDonald, selling everything from plumbing supplies and lumber to tools and hardware to hunting supplies and lumber to tools and hardware to *271 hunting supplies and gifts. Hi View had suffered its first fire in 1964, but the extent of the damage from that fire is not disclosed in the record. Petitioner had built several buildings for the Hi View business, one of which was destroyed by a second fire in 1974. Petitioner had rebuilt the building destroyed by the 1974 fire and continually repaired and made additions to the other buildings. On November 2, 1982, Hi View suffered a third fire (the 1982 fire), which destroyed or damaged four buildings, their contents, and other property. Hi View filed property loss claims with Lumbermen's Mutual Insurance Co. as follows: Property Loss Claimed
Policy Limit
Contents
$ 222,464
$ 200,000
Personal effects
20,000
4,000
Buildings #3,4,5
13,000
13,000
Asphalt
15,000
5,000
Fence
14,500
5,000
Signs
4,448
1,900
Building #1
36,725
144,000
1969 Ford truck
22,487
none stated
Debris removal
12,000
none stated
Temporary structure
4,995
none stated
Lumbermen's Mutual refused to pay the claims, and Hi View and petitioner brought suit in Federal District Court to recover for property loss and consequential damages. A jury trial was started in March 1985, but *272 a mistrial was declared. A second trial was held in July 1985, and a verdict returned for Hi View. Hi-View Lumber, Inc. v. Lumbermen's Mut. Ins. Co., Civil Action No. 83-2753 (W.D. Pa.). The resulting judgment was vacated on appeal, and the case remanded for a new trial. Hi-View Lumber, Inc. v. Lumbermen's Mut. Ins. Co., 800 F.2d 1134 (3d Cir. 1986). During May 1987, after the remand and prior to a third trial, Lumbermen's Mutual paid Hi View $ 300,000 to settle the case. The settlement proceeds (hereinafter sometimes referred to as insurance proceeds) were deposited into the escrow account of Buchanan-Ingersoll, P.C., which represented Hi View and petitioner in the Lumbermen's Mutual case. From these proceeds, Buchanan-Ingersoll retained $ 67,574 as its fee, paid $ 15,000 of litigation costs on behalf of Hi View, paid $ 215,000 directly to Hi View, and paid $ 2,426 to, or on behalf of, Hi View. Buchanan-Ingersoll drew at least two checks payable to Hi View, the first dated May 26, 1987, for $ 212,000, and the second dated June 2, 1987, for $ 3,000. The record does not disclose when or how the remaining $ 2,426 was paid. Hi View received *273 and deposited the May 26 check on May 26, 1987. The record does not disclose when, or if, the June 2 check or the remaining $ 2,426 was deposited into Hi View's bank account. [2]
The settlement proceeds were attributable to the damaged or destroyed property as follows: Insurance
Property
proceeds Inventory
$ 200,000
Other contents
5,000
Buildings 3, 4, 5
13,000
Driveway
5,000
Fence and signs
6,900
Building 1
36,725
1969 Ford truck
30,000
Debris removal
3,375
The cost bases and accumulated depreciation (allowed or allowable) of the assets destroyed or damaged by the 1982 fire were as follows: Accumulated depreciation at Property
Cost basis
Nov. 2, 1982
May 1987
Other contents
$ 1,539
$ 1,487
$ 1,539
Buildings 3, 4, 5
6,030
3,702
5,594
Driveway
3,000
2,100
3,000
Fence and signs
9,474
9,474
9,474
Building 1
29,338
15,064
20,458
1969 Ford truck
-0- -0- -0- Debris removal
-0- *274 On August 16, 1988, petitioners filed their 1987 Form 1040, which was prepared by Margaret C. Kotyk of H & R Block. That return reported the following items from Hi View: Fiscal year ended July 31, 1987:
Nonpassive income
$ 79,948
Section 179 deduction
10,000
Capital gain
45,309
Five-month period ended December 31, 1987:
Nonpassive loss
59,779
This reporting of Hi View's income, loss, gain, and deduction for 1987 was based on Hi View's original Form 1120S for the fiscal year ended July 31, 1987 (original fiscal-year Form 1120S), and its Form 1120S for the 5-month period ended December 31, 1987 (short-period Form 1120S). John A. Watson prepared Hi View's original fiscal year Form 1120S, and Ms. Kotyk prepared the short-period Form 1120S. [3] The items on both these returns were accurately reflected on petitioners' 1987 Form 1040. Hi View's original *275 fiscal-year Form 1120S reported gains from insurance proceeds received for the 1982 fire as follows: Other non- Buildings
Fence/
Inventory
depreciable
3, 4 & 5 Driveway
signs
Building 1
Proceeds
$ 200,000
$ 4,000
$ 13,000
$ 5,000
$ 9,448
$ 36,625
Cost basis
-0- -0- 6,030
3,000
9,474
29,338
Deprec.
-0- -0- 5,594
3,000
9,474
20,458
Adj. basis
-0- -0- 436
-0- -0- 8,880
Total gain
200,000
4,000
12,564
5,000
9,448
27,745
As a result, $ 213,448 of the gain was reported as ordinary income, and $ 45,309 was reported as capital gain. On Form 1120S for the fiscal year ended July 31, 1983, the year of the 1982 fire, Hi View had accurately reported its beginning inventory, but overstated its ending inventory by $ 114,000, thereby understating its cost of goods sold and overstating its gross income by like amounts. James H. Garrett, Hi View's accountant and return preparer for that year and the following 2 years, had done so in the expectation that in the next year Hi View would receive $ 114,000 of insurance proceeds that it would use to replace its inventory. On each of the Forms 1120S for the fiscal years ended July *276 31, 1984, 1985, and 1986, Hi View's schedule of cost of goods sold included the same amounts as beginning inventory as were included as ending inventory on its return for the previous year. Although it is not clear whether Hi View accurately reported its ending inventory for the fiscal years ended July 31, 1984 and 1985, Hi View accurately reported its ending inventory for the fiscal year ended July 31, 1986. Hi View therefore deducted all its destroyed and damaged inventory as cost of goods sold in one or more of the fiscal years ended July 31, 1983, 1984, 1985, or 1986. Hi View did not otherwise deduct a casualty loss for any other destroyed or damaged inventory, equipment, or building until its original fiscal-year Form 1120S. On March 6, 1989, petitioners filed a Form 1040X (1987 Form 1040X), amending their 1987 Form 1040 and reporting the following items from Hi View: Fiscal year ended July 31, 1987:
Nonpassive loss
$ 171,412
Five-month period ended December 31, 1987:
Nonpassive loss
59,776
Petitioners' 1987 Form 1040X was prepared by Kenneth C. Cowden, a self-employed tax practitioner. Respondent processed this return, and no income tax remained assessed *277 against petitioners when the notice of deficiency was issued. Petitioners' 1987 Form 1040X was based on a Form 1120S for Hi View for the fiscal year ended July 31, 1987, that was marked "AMENDED" (amended fiscal year Form 1120S) and the short-period Form 1120S. Mr. Cowden had prepared the amended fiscal-year Form 1120S, but it was never filed. Both of those Forms 1120S were accurately reflected on petitioners' 1987 Form 1040X. The amended fiscal-year Form 1120S showed that Hi View had casualty losses from the fire as follows: Other
Inventory
Business Property
Proceeds
$ 200,000
$ 4,000
Adjusted basis
222,464
20,000
Fair market
value
222,464
20,000
Total loss
22,464
16,000
If the amended fiscal-year Form 1120S had been filed, Hi View would have reported ordinary loss from involuntary conversion of $ 38,464 and no capital gain. Mr. Cowden prepared the amended fiscal-year Form 1120S believing that Hi View was "entitled to replacement costs on the insurance proceeds" having "spent much more money rebuilding the business than the $ 200,000." On its original and amended fiscal-year Forms 1120S, Hi View showed "LEGAL AND ACCOUNTING" expense of $ 89,893. *278 This amount includes the $ 82,574 of legal fees and litigation expenses paid by Buchanan-Ingersoll on behalf of Hi View, and checks, which were labeled "Atty Fees" or "Leg. Fees" in Hi View's cash disbursements journal, as follows: Date
Payee
Amount
9/15/86 Buchanan-Ingersoll
$ 1,390.06
9/26/86 Buchanan-Ingersoll
464.90
10/20/86
County of Washington
96.00
1/29/87 Buchanan-Ingersoll
1,447.72
3/26/87 Buchanan-Ingersoll
719.50
4,118.18
The record does not disclose the source of the additional $ 3,201 deducted on Hi View's returns. [4]
On April 17, 1989, petitioners filed a Form 1040X (1985 Form 1040X) on which they amended their 1985 Form 1040 and reported a net operating loss carryback from 1987. This return was prepared by Karen R. King of H & R Block. Respondent processed *279 this return, and $ 31 of income tax remained assessed against petitioners when the notice of deficiency was issued. Petitioners timely filed a 1988 Form 1040, on which they reported a net operating loss carryover from 1987 and zero taxable income. This return was prepared by Ms. King. Because Hi View did not provide respondent with adequate books and records, respondent used the cash deposits method to reconstruct Hi View's gross receipts for the fiscal year ended July 31, 1987, and determined that Hi View had understated gross receipts for that year by $ 85,601. However, during that year, Hi View needed cash (until it received the settlement proceeds), and petitioners had made advances [5] to Hi View as follows: Date
Type of consideration Amount 8/6/86
Cash
$ 3,000
8/28/86
Cash
2,000
9/8/86
Cash
5,000
10/14/86
Cash
10,000
10/24/86
Cash
5,000
11/14/86
Cash
10,000
12/4/86
Cash
3,000
1/5/87
Cash
5,000
1/20/87
Cash
5,000
1/29/87
Petitioners' check #266
6,800
3/12/87
Cash
5,000
4/28/87
Cash
10,000
5/8/87
Cash
6,000
75,800
*280 When respondent calculated Hi View's gross receipts, respondent did not reduce Hi View's total deposits for the fiscal year ended July 31, 1987, by these advances. Petitioner had also used Hi View receipts to cash checks on which he was the payee. These deposits were properly recorded as gross receipts. For the 5-month period ended December 31, 1987, Hi View erroneously included in its gross receipts $ 10,000 that had been transferred from a matured certificate of deposit into its checking account. Petitioner had also used Hi View receipts to cash checks on which he was the payee. These deposits were properly recorded as gross receipts. OPINION Our redetermination of petitioners' tax for the years 1985, 1987, and 1988, depends upon Hi View's income (or loss) for the fiscal year ended July 31, 1987, and 5-month period ended December 31, 1987. Although the disjointed record in this case has made it difficult to construct a coherent narrative, we have sorted through petitioner's efforts to augment the basis of Hi View's assets with assertions of "off-the-books" purchases and respondent's vague intimations that petitioner had skimmed Hi View's cash sales and played fast and loose *281 with Hi View's inventory. Cf. Texas Speed Distribs., Inc. v. Commissioner, T.C. Memo. 1993-446, affd. on another issue without published opinion sub nom. Wiener v. Commissioner, 36 F.3d 89 (5th Cir. 1994). Having given effect to the burden of proof, we have drawn the inferences necessary to decide each of the issues in dispute. Issue 1. Insurance Proceeds and Basis of Destroyed Property
A loss not compensated for by insurance or otherwise is allowed as a deduction for the year in which it is sustained. Sec. 165(a). However, if the taxpayer has a claim for compensation and a reasonable prospect of recovery, gain or loss is not recognized until it can be ascertained with reasonable certainty whether the loss will be fully compensated. Hudock v. Commissioner, 65 T.C. 351, 357 (1975); sec. 1.165-1(d)(2)(i), Income Tax Regs. Destruction or loss of inventory that has been purchased and received is not reflected as a loss under section 165 because it is properly reflected as a cost of goods sold in the year in which the inventory was destroyed or lost. National Home Prods., Inc. v. Commissioner, 71 T.C. 501, 530 (1979); *282 sec. 1.165-7(a)(4), Income Tax Regs.; see also Coastal Petroleum Refiners, Inc. v. Commissioner, 94 T.C. 685, 693 (1990). If property is not completely destroyed, the amount of loss to be taken into account for purposes of section 165(a) is the lesser of the reduction in fair market value of the property or its adjusted basis. Sec. 1.165-7(b)(1), Income Tax Regs. If property used in a trade or business has been completely destroyed, the amount of loss to be taken into account for purposes of section 165(a) is its adjusted basis. Sec. 1.165-7(b)(1)(ii), Income Tax Regs. The deduction allowed under section 165 is then calculated by reducing the loss to be taken into account for purposes of section 165(a) by any insurance proceeds received. Sec. 1.165-7(b)(3), Example (1), Income Tax Regs. If the taxpayer previously deducted the loss in accordance with section 1.165-1(a), Income Tax Regs., any reimbursement for such loss is included in gross income in the year of receipt, subject to the provisions of section 111. Montgomery v. Commissioner, 65 T.C. 511, 518-520 (1975); sec. 1.165-1(d)(2)(iii), Income Tax Regs. *283 If insurance proceeds from the destruction of property exceed its adjusted basis, the excess is gain from the disposition of property, and that gain is generally recognized. Secs. 1001(a), 1033(a)(2); Central Tablet Manufacturing Co. v. United States, 417 U.S. 673, 676 (1974); Cotton States Fertilizer Co. v. Commissioner, 28 T.C. 1169, 1172 (1957). However, if the taxpayer elects, the gain will only be recognized to the extent that the insurance proceeds exceed the cost of qualified replacement property. Sec. 1033(a)(2)(A) and (B); John Richard Corp. v. Commissioner, 46 T.C. 41 (1966). Petitioners presented no evidence that Hi View purchased any qualified replacement property, nor did Hi View elect to apply the nonrecognition provisions of section 1033(a). Therefore, Hi View (and hence petitioners) must recognize as gain any excess of the insurance proceeds over the adjusted basis of the property destroyed and damaged by the 1982 fire. The parties agree that the insurance proceeds should be included in Hi View's income for the fiscal year ended July 31, 1987, the year that Hi View received *284 them. The parties also agree that Hi View had a reasonable expectation of recovery throughout the years 1982 to 1987, and that Hi View had used the destroyed and damaged property in its trade or business. However, the parties dispute the amount of insurance proceeds received by Hi View, whether and to what extent Hi View had previously deducted the cost of the lost inventory, and Hi View's basis in the other destroyed and damaged property. Hi View constructively received $ 300,000 in settlement of its claims against Lumbermen's Mutual. [6] Although Hi View was not paid $ 300,000 directly, the amounts that it did not receive directly were paid to its creditors, e.g., Buchanan-Ingersoll, and were deducted as expenses, so the gross insurance proceeds are properly included in gross income. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929). *285 Petitioners contend that, in addition to the basis of inventory, equipment, and buildings that had been reported on Hi View's tax returns, Hi View should be allowed to deduct as a loss the cost of inventory, equipment, and buildings that petitioner asserts he had purchased with his own cash (but did not report on Hi View's returns), and that were destroyed in the 1982 fire. To substantiate his "off-the-books" purchases, petitioner provided copies of receipts that he had kept in a "fire box" in one of the buildings at Hi View. Very few of the receipts indicate that they were paid in cash, and some indicate that they were paid by check, while others show that the vendor was located a considerable distance from Hi View's business premises (thereby making it unlikely that petitioner would have paid cash). Mr. Cowden testified that he had investigated those receipts in preparation for trial, and that he had concluded that they were legitimate and that they had not been deducted or included on Hi View's returns prior to the 1982 fire. Mr. Cowden testified that he investigated the receipts by comparing them to Hi View's books, records, tax returns, supporting documents, and other receipts *286 from before the 1982 fire and by talking with petitioner. We were not provided with any of the documents from before the 1982 fire that Mr. Cowden had used to verify that invoices had not been deducted or included on Hi View's returns (except the 1980 and 1981 Forms 1120S). On the basis of the documents provided for trial, Mr. Cowden's conclusions were tenuous at best and almost certainly mistaken with respect to at least several pieces of equipment. Many of the invoices that were provided to substantiate petitioner's "off-the-books" purchases of inventory were for mower and tractor repair services provided after the 1982 fire. One invoice was dated May 9, 1967. A May 27, 1975, invoice for filters and a May 1, 1975, invoice for brush assemblies were both included twice. Several other invoices dated 1975 and 1976 were included, one for as little as $ 12.58. Petitioners did not provide any books or records to prove that these purchases were not already included in Hi View's cost of goods sold. Some of the invoices that were provided to substantiate petitioner's "off-the-books" purchases of equipment were for items that were listed and depreciated on Hi View's Forms 4562 for *287 1982, 1983, and 1984. There is some indication that trucks listed on invoices were traded in later years. One invoice was an installment sale contract, and several invoices were for repair services. Petitioner testified that two of the trucks listed on invoices were destroyed in the fire, and that they were not covered by insurance. However, both trucks were listed on the business auto insurance policy under which Hi View claimed the loss of the 1969 Ford truck. Many of the receipts to substantiate petitioner's "off-the-books" purchases of buildings were for items that could have been inventory, and some were explicitly for repairs. One invoice appears to be for work related to petitioner's cabin in Canada. On direct examination, petitioner was able to describe with incredible particularity each item described on an invoice and generally how the item was used. However, on cross-examination, he became vague and forgetful, often "reminiscing" or "meditating" about how a building had been constructed. Petitioner's explanations of why these items were not included in Hi View's books and records were vague and implausible. Petitioners did not provide any books or records to substantiate *288 his assertions that these purchases had not already been included in Hi View's cost of goods sold. To substantiate the costs of repairing some of Hi View's buildings, petitioners provided repair proposals and estimates that do not indicate whether the work was actually performed. The invoices provided by petitioner to substantiate his "off-the-books" purchases are inadequate. Those invoices and petitioner's explanations of why the "off-the-books" purchases were not included in Hi View's books and records contain too many inconsistencies and loose ends to be given enough weight to sustain petitioners' burden of proof. [7]
To substantiate the amount of inventory Hi View lost in the 1982 fire, petitioners provided copies of insurance claim documents. Although the insurance claim documents show that the value of the *289 inventory was the "cost" of the items, it is apparent that many of the amounts are estimates. Mr. Gorman himself testified that he is a shrewd shopper and that he often bought materials at distress sales for bargain prices. Petitioners have not shown that the "costs" used in the insurance documents were based on Hi View's actual costs. They may very well have been average industry costs or estimated costs, particularly because Hi View did not have any records to support the "costs" used on the claim documents. In any event, petitioners' assertions about the "cost" of Hi View's lost inventory are irrelevant. The destroyed or damaged goods were purchased, were physically placed in Hi View's inventory, and, because we have rejected petitioners' assertions of "off-the-books" purchases, were presumably reflected in Hi View's inventory purchases. The destruction of inventory, therefore, should have been reflected in Hi View's cost of goods sold for the fiscal year ended July 31, 1983, the year of the fire. National Home Prods., Inc. v. Commissioner, 71 T.C. at 530. However, Hi View overstated its ending inventory for the fiscal year ended July 31, 1983, *290 by the anticipated replacement cost of inventory ($ 114,000) and therefore did not deduct the entire inventory reduction caused by the 1982 fire during that fiscal year. [8] We are satisfied, however, that Hi View did deduct the inventory reduction as a cost of goods sold in, or prior to, the fiscal year ended July 31, 1986, the year preceding its receipt of the insurance proceeds. The 1982 fire severely reduced the value of Hi View's physical assets. However, the amount of loss deductible under section 165 is limited to Hi View's adjusted basis in the assets (less any insurance recovered), and in *291 1987, the year before us, Hi View received settlement proceeds from the 1982 fire well in excess of its basis in the destroyed and damaged assets. The following table summarizes our findings on Hi View's insurance proceeds received and the gain realized on property destroyed or damaged by the 1982 fire: Other
Buildings
Fence/
Building
Inventory
contents
3, 4 & 5
Driveway
signs
[1]
Proceeds
$ 200,000
$ 5,000
$ 13,000
$ 5,000
$ 6,900
$ 36,725
Cost basis
-0- 1,539
6,030
3,000
9,474
29,338
Deprec. [2]
-0- 1,539
5,594
3,000
9,474
20,458
Adj. basis
-0- -0- 436
-0- -0- 8,880
Gain
200,000
5,000
12,564
5,000
6,900
27,845
*292 Ford
truck
Proceeds
$ 30,000
Cost basis
-0- Deprec. [2]
-0- Adj. basis
-0- Gain
30,000
Our finding of the basis of the property destroyed and damaged by the fire is based primarily on admissions included in the fiscal-year Form 1120S, which we have adjusted as appropriate, bearing in mind other evidence and the parties' burdens of proof. Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Siewert v. Commissioner, 72 T.C. 326, 337 (1979). Hi View also received $ 3,375 of insurance proceeds attributable to debris removal. However, petitioners did not offer any evidence to show that Hi View incurred any cost to remove debris, and we find it more likely that petitioner and his son removed the debris themselves. Therefore, we have found that all insurance proceeds attributable to debris removal are recognized as ordinary income. Our findings result in $ 329,148 more income from the 1982 fire than petitioners included on their 1987 Form 1040X, but only $ 31,927 more -- the amount of additional insurance proceeds asserted in respondent's *293 amended answer -- than petitioners included on their original 1987 Form 1040. Issue 2. Bank Deposits
When the Internal Revenue Service audits a taxpayer's return, the taxpayer should provide the auditor with adequate records. If the records provided by the taxpayer are inadequate, the auditor will test the taxpayer's position by using an indirect method. 1 Audit, Internal Revenue Manual (CCH), sec. 820, at 7245-27. The records in this case were not available, [9] so respondent used bank records to verify and ultimately reconstruct Hi View's income. We have found that the correct amount of gross receipts for the fiscal year ended July 31, 1987, was $ 9,801 greater than reported by Hi View and $ 75,800 less than determined by respondent. The bank deposits *294 method is accepted as an appropriate indirect method of calculating the taxpayer's income. Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Although bank deposits are presumed to be income, the presumption is not conclusive, id., and several adjustments are generally made to arrive at gross income. One such adjustment decreases the total bank deposits by nonincome deposits. Examples of nonincome deposits are contributions to capital, loan proceeds, cash on hand at the beginning of the year, redeposits, and transfers from one bank account to another. Sec. 1032(a); Mallette Bros. Constr. Co. v. United States, 695 F.2d 145, 149 (5th Cir. 1983); United States v. Boulet, 577 F.2d 1165, 1167 (5th Cir. 1978); Estate of Mason v. Commissioner, supra at 660-661. Because respondent is only reconstructing Hi View's gross receipts, deposits of other types of income (interest and insurance proceeds) are also subtracted from total deposits. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), *295 affd. 959 F.2d 16 (2d Cir. 1992); 1 Audit, Internal Revenue Manual (CCH), sec. 838, at 7247-6. Respondent used the cash deposits method to reconstruct Hi View's gross receipts for the fiscal year ended July 31, 1987. Respondent reduced Hi View's total bank deposits by the amount of interest income, insurance proceeds, and transfers deposited to the account during the year. Petitioners do not challenge respondent's authority to use the cash deposits method. Petitioners contend instead that they gave cash and personal checks to Hi View as loans, and that Hi View's total bank deposits for the fiscal year ended July 31, 1987, should be reduced by the amount of those loans. Although we need not decide whether the deposits in issue were loans or capital contributions, we agree that petitioners made nontaxable advances during the fiscal year ended July 31, 1987, but we find that the amounts of the advances are somewhat less than the total amount asserted by petitioners. [10]
*296 Petitioners did not tell respondent about the existence of the cash they kept in a safety deposit box until after respondent had issued the notice of deficiency.[11] We recognize the problematic character of a cash hoard claim and understand the reluctance of respondent and the courts to accept taxpayers' unsubstantiated claims. Holland v. United States, 348 U.S. 121, 127 (1954). However, petitioners in this case have substantiated that they had a cash hoard and that they had advanced some of the cash to Hi View. See Reaves v. Commissioner, 31 T.C. 690, 718-719 (1958) (accepting claim based on wife's credible testimony), affd. 295 F.2d 336 (5th Cir. 1961); Estate of Mazzoni v. Commissioner, T.C. Memo. 1970-37 (accepting only a portion of the purported claim), affd. 451 F.2d 197, 201 (3d Cir. 1971). *297 A bank teller testified that, on several occasions, she had seen more than $ 50,000 of cash in petitioners' safety deposit box. Petitioners provided a copy of one of their canceled checks, payable to Hi View in the amount of $ 6,800, [12] and they provided a contemporaneously prepared journal of deposits, which identified most of the claimed advances as loans. We find that $ 75,800 of the deposits to Hi View's bank account during the fiscal year ended July 31, 1987, was either loans or contributions to capital, and therefore, that petitioners understated Hi View's gross receipts from sales by no more than $ 9,801.
Issue 3. Overstated Gross Receipts
For the 5-month period ended December 31, 1987, respondent determined that Hi View's cost of goods sold was overstated by $ 46,000. Petitioners have conceded that the cost of goods sold was overstated but have asserted *298 that the overstatement of cost of goods sold was offset by an overstatement of gross receipts. To prove their assertion, petitioners reconstructed Hi View's gross receipts using the bank deposits method. Before trial petitioners and respondent agreed to the total deposits for the period and reductions for interest income and certain credit memos. At trial, petitioners provided an additional credit memo for $ 10,000, which they asserted was a transfer from a certificate of deposit, and checks totaling $ 25,192, drawn on Hi View's account, made payable to petitioner (or his son), and deposited into Hi View's account, which they assert were loans to Hi View. Respondent has conceded that, if any of the above deposits were from nontaxable sources, reported gross receipts should be reduced by that amount. Respondent has also conceded that the credit memo for $ 10,000 was a transfer and that gross receipts were overstated by that amount. Although the Hi View checks in question were "redeposited" into Hi View's account, we have not been persuaded that they were loans or contributions to capital. The deposit journal does not list them as loans, and, at the time they were deposited, *299 Hi View had received the insurance proceeds and did not need cash. We find it more likely that petitioner cashed the checks using Hi View's cash receipts and then deposited the checks into Hi View's account instead of cash. Issue 4. Sections 6653(a) and 6661 Additions to Tax
For all the years in issue, respondent determined additions to tax under section 6653(a). For all the years in issue, section 6653(a) imposes an addition to tax equal to 5 percent of an underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. For 1985 and 1987, section 6653(a) imposes an additional amount equal to 50 percent of the interest payable on the portion of underpayment attributable to negligence. Negligence is the failure to exercise due care or to act as a reasonable and prudent person. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a). Petitioners provided no evidence that their underpayments were not due to negligence or intentional disregard of rules or regulations. Subject to the Rule *300 155 computation, respondent's determinations of section 6653(a) additions to tax are sustained. Respondent also determined additions to tax for substantial understatement under section 6661 for 1987 and 1988. If there is a substantial understatement of income tax for any taxable year, section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to the understatement. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $ 5,000. Sec. 6661(b)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return but is reduced if the taxpayer either had "substantial authority" for, or adequately disclosed, the tax treatment shown on the return. Sec. 6661(b)(2). Respondent's determination of the addition is presumed to be correct, and petitioners bear the burden of proving that they are not liable for this addition to tax. Rule 142(a). Petitioners provided no evidence to show that they had authority for their understatements, and their tax returns did not disclose their understatements. Accordingly, if the Rule 155 computation *301 reveals that petitioners substantially understated their 1987 or 1988 tax liability, respondent's determinations of section 6661(a) additions to tax for either or both those years will be sustained. To reflect the foregoing and issues that have been settled, Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest on the deficiency.↩
1. Hi View had been reporting on a fiscal year ended July 31 but changed to a calendar year after the fiscal year ended July 31, 1987. See sec. 444. Petitioners' 1987 Form 1040 included pass-through amounts from Hi View's returns for both the fiscal year ended July 31, 1987, and the 5-month period ended Dec. 31, 1987.↩
2. The parties have stipulated that Lumbermen's Mutual paid Hi View $ 300,000, and the facts disclosed by the record do not contradict that stipulation. Cf. Jasionowski v. Commissioner, 66 T.C. 312, 318↩ (1976).
3. Mr. Watson had also prepared a Form 1120S for the 5 months ended Dec. 31, 1987, but petitioner refused to accept it, and Hi View did not file it.↩
4. The additional $ 3,201 may be partially explained by the $ 2,426 of unexplained disbursements from Buchanan-Ingersoll's escrow account. In any event, respondent has allowed the entire deduction of $ 89,893.↩
5. We have not been asked to decide, and we do not express any opinion on, whether the advances were loans or contributions to capital.↩
6. On brief petitioners' counsel asserted that "The total settlement amount was $ 300,000.00. Deductions therefrom were $ 12,500.00 for the adjuster/appraiser and legal fees of $ 7,099.00 and $ 84,166.55. Thus the actual proceeds of the insurance litigation to the taxpayer was $ 196,234.45." Hi View's asserted casualty loss ($ 429,586.96) was then calculated using the "actual proceeds". However, because the legal fees and litigation expenses were properly deducted as "LEGAL AND ACCOUNTING" expense in the fiscal year ended July 31, 1987, and prior years, using the "actual proceeds" to calculate the casualty loss results in a double deduction of those fees and expenses.↩
7. E.g., petitioner testified that some of the inventory was not on Hi View's books because it was to be sold in Canada, but he later testified that any Canadian sales were recorded on Hi View's books.↩
8. Petitioner seems to assert that Hi View underreported its beginning inventory for the year ended July 31, 1983. Hi View reported $ 130,000 of beginning inventory for the year ended July 31, 1983, and petitioner testified that he had told Mr. Garrett that Hi View had $ 330,000 of inventory on July 28, 1982. However, petitioner's testimony is not otherwise supported by the record, and we do not accept his assertion. ↩
1. We recognize that the 1969 Ford truck had some cost basis that had been fully depreciated prior to the fire and is subject to sec. 1245 recapture. The insurance proceeds attributable to the truck were not included on Hi View's original fiscal-year Form 1120S, and respondent did not include them on the notice of deficiency. However, respondent increased the deficiency in her amended answer, asserting that the gain on the 1969 Ford truck was ordinary income, and respondent had the burden of proving the truck's cost basis and accumulated depreciation. Respondent has not done so, and therefore, the gain is treated as long-term capital gain under sec. 1231.↩
2. Includes depreciation deductions allowed or allowable.Sec. 1016(a)(2).↩
9. At various times during the audit and trial, petitioners asserted that Hi View's records were either stolen, scattered, or burned during a burglary that occurred shortly after respondent's agent contacted petitioners to schedule an audit of Hi View.↩
10. We do not accept petitioners' contention that checks drawn on Hi View's account or third-party accounts, made payable to petitioner, and deposited into Hi View's account were advances to Hi View.↩
11. On brief, respondent makes much of petitioner's failure to mention the cash hoard or advances to Hi View during the audit. We decline respondent's apparent invitation to go behind the notice of deficiency, but note that respondent's agent may have confused and unnerved petitioner during the audit by asking him if he kept any "mad money". We also need not address whether the cash hoard had its origin in gifts from petitioner's mother, as petitioners assert, or in cash skimmed from Hi View's receipts, as respondent intimates.↩
12. Petitioners provided a copy of a second check, but it was not listed on the deposit journal as a loan. We infer that it was for another purpose.↩