GEORGE C. SNYDER AND SHARON A. SNYDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Snyder v. Commissioner
Docket No. 14220-92
United States Tax Court
T.C. Memo 1995-285; 1995 Tax Ct. Memo LEXIS 286; 69 T.C.M. (CCH) 3016; June 26, 1995, Filed *286 Decision will be entered under Rule 155. For petitioners: Thomas A. Crawford, Jr.
For respondent: Frank A. Falvo and Michael A. Yost, Jr.
BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Additions to tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6661(a) 1986
$ 3,400
[1] $ 170
1987
25,685
[2] 1,284
1988
366,703
18,335
$ 91,676
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The term "petitioner" in the singular refers to Mr. Snyder. The parties have agreed that there are no deficiencies in, or additions to, petitioners' Federal income taxes for 1986 and 1987, and that petitioners are not entitled to a minimum tax credit for 1988, which was based on the alternative minimum tax originally determined for 1987. The issues for 1988 are: (1) Whether petitioners are entitled to a loss deduction *287 in the amount of $ 1,750,000, as claimed in their original income tax return or some larger amount, as subsequently claimed by them; (2) whether petitioners are entitled to deduct $ 19,143 of real-property taxes; (3) whether petitioners are liable for self-employment tax of $ 2,492 under section 1401; and (4) whether petitioners are liable for additions to tax under sections 6653(a)(1) and 6661. We hold for respondent on all issues. FINDINGS OF FACT Petitioners resided in North Versailles, Pennsylvania, when they filed their petition. During the year in issue, petitioners had proprietary interests, some active and others inactive, in a variety of businesses. Petitioners had interests in seven or eight motels (five of which they owned outright), a glass factory, a farm, a mold-making operation, and a small resort. On March 1, 1976, petitioners entered a contract for deed with Herbert M. and Ruth Solomon, to purchase the property and buildings at 3775 William Penn Highway in Monroeville, Pennsylvania (Solomon property), for $ 373,000. The contract provided for the sale of all fixtures and personal property attached to, or contained in, and used in connection with, the property. *288 The Solomon property included a restaurant (Hunan Gardens), which was under lease to a third party, and a motel, which petitioners operated as the Blue Moon Motel. The Solomon property was subject to a first mortgage to Sentinel Savings Association, and a second mortgage to various members of the Abriola family, payments on which were to be made from the monthly payments on the contract for deed. Interest was payable to the Solomons at the rate of 9.25 percent per year. On January 1, 1988, petitioners were the equitable owners of the Solomon property, and were the fee title owners of an adjacent property they had purchased from the Estate of Rose Bogovich (collectively the Blue Moon property). Petitioners were in litigation to obtain fee title to the Solomon property. On January 14, 1988, petitioners entered into an agreement to sell the Blue Moon property to L&M Associates, d/b/a Oxford Development Co. (Oxford) for $ 1,536,000. The sale was contingent on Oxford's acquiring an adjacent property, which it did acquire. Oxford planned to acquire the Blue Moon property and five or six nearby properties, and build a shopping center on them. Oxford paid petitioners $ 125,000 as an earnest *289 money deposit. Between January 14 and September 25, 1988, disputes arose between petitioners and Oxford, and petitioners refused or were unable to convey the Blue Moon property to Oxford. Prior to September 27, 1988, the Solomons had executed and delivered to Oxford a deed to the Blue Moon property. On September 27, 1988, petitioners and Oxford entered into an agreement to settle the disputes. Oxford paid petitioners $ 1,586,000, consisting of the $ 125,000 previously paid, $ 1,153,000 in cash or certified funds, and Oxford's promissory note for $ 308,000, less payment of the Vanguard Federal Savings mortgage [1] and other closing costs. Petitioners transferred their rights in the Blue Moon property to Oxford, and agreed to "terminate all business operations on the [Blue Moon] Property and remove personal property and salvage property from the [Blue Moon] Property by November 1, 1988, time being of the essence." *290 Petitioners deposited a portion of the proceeds from the settlement into a bank account, and invested approximately $ 500,000 of the proceeds in silver. Although the Hunan Gardens lease did not expire by its terms until January 31, 1989, the lessee stopped operations and abandoned the premises during the summer of 1988. In early October 1988, the restaurant area of the Blue Moon building was filthy, and did not contain a fully equipped kitchen. At the time of the transfer, the Blue Moon Motel was a 22-room rundown motel. The contents of a typical motel room were a bed, a desk, a dresser, a mirror, a picture, and a television set, all of which were worn and dirty. The Blue Moon building was dilapidated and uninviting. Room rates at the motel had been $ 20-25 per night and about one-half that amount as an hourly rate for truckers and other short-stay visitors. The Blue Moon building did not have a basement or an elaborate security system. On November 8, 1988, when employees of Oxford and a demolition company arrived at the Blue Moon property to start preparations for demolition, the Blue Moon Motel was still operating. There was an altercation between petitioner and an employee *291 of the demolition company. The police responded to a call, and ordered petitioner and the employees of Oxford and the demolition company to leave the Blue Moon property, which they did. Because the Blue Moon Motel was still operating, preparations for demolition did not begin on November 8, 1988. None of petitioners' property was destroyed or removed from the Blue Moon property on that day. On November 9, 1988, employees of Oxford and the demolition company returned to the Blue Moon property with two security guards. They told the manager and two guests of the motel to leave, which they did. The Oxford employees then turned off the water, gas, and electricity, and the demolition company employees removed exterior doors and windows. Around 4:00 or 5:00 p.m., the employees of Oxford and the demolition company left the Blue Moon property, but the security guards remained. None of petitioners' property was destroyed or removed from the Blue Moon property on that day. On November 10 and 11, 1988, employees of Oxford removed, and placed in storage, all petitioners' furniture, equipment, and supplies located on the Blue Moon property (except a truck). On March 27, 1989, Oxford returned *292 the furniture, equipment, and supplies to petitioners. The returned furniture, equipment, and supplies were substantially all the tangible personal property on the Blue Moon property on November 4, 1988, and were generally in the same condition as they had been in early October 1988 and on November 10 and 11, 1988. Security guards were posted on the Blue Moon property from November 9, 1988, until the Blue Moon building was demolished. In January 1989, the demolition company tore down the Blue Moon building, and other Oxford contractors excavated the Blue Moon property down to underlying solid material and filled it back up to the desired grade. During the course of this operation, the Oxford contractors tested the Blue Moon property for voids and underground tanks and utilities to assure that it would support the building that was to be built. In May 1986, petitioners had purchased for $ 75,000 an old, dilapidated glass factory that had housed the Westmoreland Glass Co. (Westmoreland). Prior to that time, Westmoreland had sold at auctions the entire contents of the factory, except for approximately 2,000 glass molds. On April 11, 1987, petitioners purchased the 2,000 glass molds *293 and the right to use the Westmoreland trademark in exchange for a promissory note for $ 30,000 bearing interest at 8 percent. Petitioners filed their Federal income tax return for 1988 on May 9, 1990 (original 1988 Form 1040). Michael Tomko signed the original 1988 Form 1040 as paid preparer. On the original 1988 Form 1040, petitioners reported income, losses, and deductions as follows: Interest income
$ 79,193 Dividend income
13 Capital gain
Installment sale
$ 1,818 Blue Moon property
1,161,255 Capital loss carryover
(141,907)
Total capital gain
1,021,166 Other losses
Blue Moon property
222,942 Business bad debt
("Fires, Thefts, etc")
(1,750,000)
Total other losses
(1,527,058)
Rents
Blue Moon Motel
70,715 Moonlite Motel
(2,282)
Sleepy Hollow Motel
6,656 Castle Loma Motel
21,000 Hiland Terrace Motel
45,600 Total rents
141,689 Other income
11,000 Adjusted gross income
(273,997)
Itemized deductions
94,192 Exemptions
7,800 Taxable income
(375,989)
Total tax
-0-  Refund of estimated tax payments
4,000 On the Form 4797 included with the original 1988 Form 1040, petitioners calculated *294 the gain from the sale of the Blue Moon property as follows: Gross sales price
$ 1,536,000
Cost basis
374,745
Accumulated depreciation
adjustment
[1] 222,942
Adjusted basis
151,803
Total gain
1,384,197
On March 25, 1992, respondent issued the notice of deficiency in this case. On June 25, 1992, petitioners timely filed their petition. On August 21, 1992, petitioners filed a Form 1040X (1988 Form 1040X) amending their original 1988 Form 1040. Petitioners signed the 1988 Form 1040X as taxpayers, and petitioner also signed as paid preparer. On the 1988 Form 1040X, petitioners claimed an additional itemized deduction of $ 72,651,900 for theft loss, consisting of $ 7,652,000 attributed to cash, plus $ 65,000,000 attributed to "Glass molds, Equipment, Fixtures, Supplies, Etc.", less $ 100 pursuant to section 165. No explanation was given for the different treatments of the "Fire, Theft, etc." loss on the original 1988 Form 1040 and the theft loss on the 1988 *295 Form 1040X. Prior to April 21, 1993, petitioners filed a complaint with the Court of Common Pleas of Allegheny County, Pennsylvania, against 19 individuals, Oxford, the demolition company, the Municipality of Monroeville, and Allegheny County. On April 21, 1993, petitioners were ordered to file an amended complaint setting forth each claim in a separate cause of action, and attributing particular conduct to each defendant. Between April 21 and June 25, 1993, petitioners filed an amended complaint. On June 25, 1993, petitioners were again ordered to file a more specific pleading. On July 14, 1993, petitioners filed a second amended complaint that was submitted by Thomas A. Crawford, Jr., petitioners' counsel in the case at hand. The second amended complaint alleged that the defendants conspired to coerce petitioners into selling the Blue Moon property "having a fair market value of at least $ 4,000,000 for $ 1,536,000", and that the defendants deprived petitioners of $ 48,250,000 of cash, $ 546,856 of personal property and salvage, and $ 790,000 of records, all of which were kept at the Blue Moon property. On September 22, 1993, the Allegheny Court of Common Pleas dismissed petitioners' *296 second amended complaint with prejudice. OPINION Mr. Crawford originally had 90 days after the conclusion of trial to file petitioners' brief (rather than 75 days as is customary under Rule 151(b)(2)). After missing that deadline, he was given an additional 48 days, and petitioners' brief was finally lodged with this Court 9 days after the extended deadline. We accepted petitioners' brief in order to allow them to try to untangle the evidence so as to support their implausible story, and to prevent them from suffering as a result of their counsel's neglect. Petitioners' brief was no help. It states "Since the issues are wholly factual in nature, the law of taxation is of little assistance in resolving this matter and this brief must necessarily be in the nature of a summation rather than a memorandum of law", and summary it is. Neither petitioners' brief [2] nor their trial memorandum includes any citation of authority for allowing the deductions that were disallowed by respondent. See Rule 151(e)(1), (5). The brief, although in the nature of a factual summation, summarized testimony more than facts, and did so by way of a rambling narrative rather than concise, numbered statements *297 of proposed facts. See Rule 151(e)(3). Many of the assertions and calculations included in petitioners' brief were inaccurate, erroneous, and in at least one instance, directly contrary to petitioner's testimony. However, even with a more professionally adept and diligent performance by counsel, we do not think that petitioners could have substantiated their story, and they certainly have not done so on this record. Issue 1: Petitioners' "losses"
Petitioner's stories about his astronomical losses center around Mr. Tomko and $ 90 million of cash. However, petitioners did not list Mr. Tomko as a witness, did not call him to testify, and did not explain their failures to do so. In view of the inherent incredibility of petitioners' story and the critical importance of petitioners' alleged purchases from Mr. Tomko (both to prove that they occurred and to support the alleged cash hoard), we think that, for petitioners to have *298 carried their burden of proof, it was incumbent upon them to produce Mr. Tomko as a witness or explain their failure to do so. Philhall Corp. v. United States, 546 F.2d 210, 215 (6th Cir. 1976); Kappenberg v. Commissioner, T.C. Memo. 1994-292. They have done neither. Although we do not presume that Mr. Tomko's testimony would have been unfavorable to petitioners' allegations, cf. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), petitioners' case is fatally deficient without his testimony. See Sisson v. Commissioner, T.C. Memo. 1994-545. Petitioner's descriptions of Mr. Tomko paint him as an untrustworthy individual, which may explain why petitioners did not call him to testify. More important to the case before us however, petitioner's characterization of Mr. Tomko undermines the trustworthiness of the documents that Mr. Tomko allegedly executed. Without Mr. Tomko's testimony or trustworthy documentary evidence, petitioner's self-serving testimony stands alone. We are not *299 required to accept petitioner's stories as true, particularly when inconsistent and contradicted by other evidence. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Barrasso v. Commissioner, T.C. Memo. 1978-432, affd. sub nom. De Cavalcante v. Commissioner, 620 F.2d 23, 27 (3d Cir. 1980)(Tax Court empowered to disregard self-serving testimony of the taxpayer and others). Petitioners' asserted losses have grown and shrunk and changed character several times since their original 1988 Form 1040 was filed. On the original 1988 Form 1040, which Mr. Tomko signed as paid preparer, petitioners claimed a "BUSINESS BAD DEBT Fires, Thefts, etc." deduction of $ 1,750,000. Petitioner testified that this amount "was money that I paid to Tomko to do some renovations on some properties", an assertion that petitioner never fully explained. On March 25, 1992, respondent issued a statutory notice of deficiency disallowing the $ 1,750,000 deduction. On June 25, 1992, petitioners filed their petition in which they stated that *300 the $ 1,750,000 bad debt deduction reflected losses and destruction of the taxpayers' property in that amount through theft and vandalism and overpayment of basis (purchase price). The basis used to recompute the petitioners' profit from a sale of land was inappropriate because the taxpayers' basis was much higher than the amount used due to the overpayment of the contract purchase price, because of the loss of improvements, fixtures, appliances and construction put into the property which was not depreciated through the vandalism and conversion of the purchasers and their agents, and due to theft losses of glass molds stolen from the petitioners' glass works.
The alleged facts on which petitioners relied were as follows: The taxpayers suffered losses of three sorts which were disallowed by the Revenue Officer. First they overpaid the purchase price for the property sold to Oxford Development Company, which should have raised the basis or should have been treated as a bad debt loss. Second, the Bouough [sic] of Monroeville prohibited the petitioners from taking the improvements, fixtures, appliances, furnishings and structural salvage to which they were entitled in the *301 Oxford sales agreement and settlement. These were undepreciated items which were added to the motel and restaurant which was then demolished by Oxford and its agents. As this was an item due to the taxpayers by Oxford and was circumvented by the Borough, it became a loss, bad debt expense and an addition to the basis for the sale of at least $ 3000000.00. Whatever way it is properly handled, the revenue officer took none of it into account. Finally, the other major loss occurred by the theft of many glass molds from petitioners' glass works. 1200 molds were stolen. They were purchased by the taxpayers at an average of $ 11000.00 per mold and replacement costs were between $ 2800.00 and $ 18000.00 per mold, which were being used or rented out in the petitioners' glass business, a loss of $ 13200000.00, which was completely disallowed.
Petitioners did not state the amount by which they overpaid the contract purchase price. On or about August 14, 1992, petitioners filed the 1988 Form 1040X including an additional "Theft loss in the amount of 72651900.00". Petitioners reported that the $ 72,651,900 loss included $ 7,652,000 of cash, and $ 65 million of "Glass molds, Equipment, *302 Supplies, Etc." On March 15, 1994, Mr. Crawford submitted petitioners' brief, on which petitioners appear to contend that they lost: Cash (from the Blue Moon)
$ 48,000,000
Motel furniture, fixtures,
and supplies (from the Blue Moon)
9,316,041
Restaurant fixtures and equipment
(from Hunan Gardens)
546,856
Glass molds (from the Blue Moon and
Westmoreland factory)
3,362,601
Other items (from the Westmoreland
factory)
75,000
Total losses
61,300,498
Petitioners also appear to be contending, through Mr. Crawford's calculations, that the gain from the sale of the Blue Moon property was $ 572,864. All this has been put forth to support the deduction of a loss that was originally reported to be $ 1,750,000. The allegedly lost cash was said to be the amount remaining from a gift of $ 90 million of cash received from petitioner's "good friend" Herschel Wiseman, deceased. The alleged motel and restaurant furniture, fixtures, and supplies were purchased from Mr. Tomko for cash. A portion of the allegedly lost glass molds were part of 2,300 glass molds purchased from Mr. Tomko for a $ 35,000,000 note (although the loss was calculated on "cost actually paid out" of $ 6 million *303 of cash), and the other lost glass molds were part of 2,000 glass molds purchased from Westmoreland for $ 30,000. The "other items stolen from the factory * * * [had] a value of between $ 300,000.00 and $ 500,000.00 but [had been] purchased along with the factory for $ 75,000.00." Mr. Crawford's calculation of the gain decreases the gross sales price reported on the original 1988 Form 1040 by $ 634,333 (for Oxford's alleged underpayments of the sale of the Blue Moon property), increases the cost basis reported on the original 1988 Form 1040 by $ 55,000 (for petitioners' alleged overpayment of the purchase price of the Solomon property), and decreases the accumulated depreciation adjustment reported on the original 1988 Form 1040 by $ 173,745. Neither petitioners' trial memorandum nor their brief cites section 165 or any case applying its provisions. Nor do they set forth the requirements for a loss to be deductible under section 165, or on any other ground for that matter. However, we assume, as did respondent, that petitioners are attempting to deduct their losses under section 165. A loss not compensated for by insurance or otherwise is allowed as a deduction for the year in which *304 it is sustained. Sec. 165(a). However, if the taxpayer has a claim for reimbursement and a reasonable prospect of recovery, a loss is not recognized until it can be ascertained with reasonable certainty whether the loss will be fully recovered. Hudock v. Commissioner, 65 T.C. 351, 357 (1975); sec. 1.165-1(d)(2)(i), Income Tax Regs.
If property is not completely destroyed, the amount of loss to be taken into account for purposes of section 165(a) is the lesser of the reduction in fair market value of the property, or its adjusted basis. Sec. 1.165-7(b)(1), Income Tax Regs. If property used in a trade or business has been completely destroyed, the amount of loss to be taken into account for purposes of section 165(a) is its adjusted basis, reduced by any recovery received. Sec. 1.165-7(b)(1)(ii), (3)Example (1), Income Tax Regs. Petitioners have not proved that they had any tangible personal property at the Blue Moon property in excess of what they acquired from the Solomons. The tangible personal property removed from the Blue Moon property, stored in three storage sheds, and returned to petitioners is entirely consistent with the contents *305 of a 22-room motel and an abandoned restaurant. We find it incredible that petitioner had $ 48 million of cash, or that, if he had $ 48 million of cash, he would have kept it and left it at a rundown motel without an adequate security system, particularly after he had sold the motel. Despite the alleged documentation of purchases from Mr. Tomko, we do not believe that petitioners purchased the motel and restaurant furniture, fixtures, and supplies for which they allegedly paid a total of $ 9,862,897, or the glass molds for which they allegedly paid $ 35 million. We find petitioners' stories incredible and Mr. Crawford's calculations of reduced proceeds and increased basis inaccurate and erroneous. Most of petitioners' asserted losses relate to petitioner's story about a $ 90 million cash hoard kept in a 30-by-30-foot, underground, fire-proof, fortified room underneath the Blue Moon Motel that not even Mrs. Snyder knew about. First, we note that the asserted amount of lost cash has fluctuated considerably. Neither the original 1988 Form 1040 nor the petition asserted any lost cash. The 1988 Form 1040X dated August 14, 1992, reports a $ 7,652,000 deduction for lost cash. On July 14, *306 1993, petitioner filed the second amended complaint in the lawsuit against Oxford in which he alleged that he had been deprived of $ 48,250,000 of cash kept at the Blue Moon property. Petitioners' trial memorandum stated that petitioner would "confirm * * * the keeping of funds in the safe at the Blue Moon Motel", but did not state the amount allegedly kept in the safe. At trial, petitioner testified that he lost $ 60 million of cash and that Mr. Tomko lost $ 11 million. On brief, petitioners asserted that they lost $ 48 million of cash. Petitioners have offered no explanation of why the lost cash has gone from zero to $ 7,652,000 to $ 60 million to $ 48 million since filing their petition. We find it unlikely that even a "good friend" would give an unrelated person $ 90 million in cash for the benefit of the donee's children because he "thought a lot of" them. Petitioner mentioned a schedule of disbursements to the children, but did not otherwise provide any description of the terms of the alleged trust or the schedule of disbursements. We find it unusual that a relatively successful businessman would not have invested $ 90 million, [3] particularly when he could have earned for *307 the benefit of his children more than $ 4 million per year in a mere passbook savings account. Petitioner's assertion that he did not invest it because he "had plenty of money" is belied by his various other business ventures, and his investment of the proceeds of sale of the Blue Moon property. We find it unlikely that someone with many millions of dollars of cash would borrow and pay interest (up to 9.25 percent) rather than using the cash, particularly when the cash was allegedly used for other similar acquisitions. We find it unreasonable that petitioner had built a 30-by-30-foot underground, fortified, fire-proof room by himself, that no one else knew where it was located, and that it would not have been found when the Blue Moon Motel was destroyed and the property *308 was excavated. We find it unreasonable to think that, if the room had been found and the cash had been stolen, the discovery of $ 48 million of cash could have been kept secret. We find petitioner's stories of how he spent portions of the $ 90 million to be incredible. On October 7, 1988, 10 days after agreeing to sell the Blue Moon property, and 24 days before he had agreed to vacate it, petitioner allegedly used $ 9,316,041 of cash to purchase the contents of the Blue Moon Motel from Mr. Tomko. The alleged "Bill of Sale" that was introduced to substantiate the asserted purchases lists furniture, fixtures, equipment, and supplies that would have furnished a very nicely appointed motel and Chinese restaurant. Neither the Blue Moon Motel nor Hunan Gardens was nicely appointed. The project manager for Oxford described the motel rooms and their contents as "worn, tattered, frayed, dingy, [and] dirty", and the restaurant as "one of the more filthy, disgusting things I'd seen." On October 7, 1988, petitioner allegedly used $ 11.5 million of cash to pay Mr. Tomko for "Construction, remodel, refurbish, refurnish, and repair" the Thursdays Motel and Lounge, Westmoreland Glass Company, Moonlite *309 Motel, Sleepy Hollow Motel, Elliott Road, 98 Arlene Drive, Super 30 Motel, Castle Loma Motel, Hiland Terrace Motel, 261 Foster Road, 2740 Clay Pike, and Old Field Fork property. [4] The alleged payment was evidenced by a one-page "Proposal" marked "Paid in full" and signed by petitioner and Mr. Tomko. Mr. Tomko had not started to work on the alleged projects, but petitioner had paid Mr. Tomko in full "So he would do it." Payment of a deposit on a contract is common, but an experienced businessman would not make full payment on an $ 11.5 million contract until the work was completed. Petitioner's story of a third payment to Mr. Tomko on October 7, 1988, is even more unlikely. At trial petitioners also introduced a "Cash Reciept [sic]", dated October 7, 1988, from Mr. Tomko for $ 6 million. *310 Although petitioner's story changed somewhat after it was pointed out that the "Bill of Sale" for $ 9,316,041 included 600 glass molds for $ 6 million, petitioner had initially alleged that the "Cash Reciept [sic]" was evidence of a payment of $ 6 million of cash as a partial payment on an alleged $ 35-million note to Mr. Tomko. [5] *311 However, the only payments required by the terms of the note were 50 percent of the income from the lease of, or manufacture of products from, certain glass molds. Petitioners had received little or no income from glass molds, and certainly not $ 12 million. [6]
According to petitioner, in one day he gave Mr. Tomko in excess of $ 20 million of cash for services not yet performed, a note not yet due, and property contained in a building about to be destroyed. We do not believe that petitioner hired Mr. Tomko to perform any repair services, that petitioner purchased any glass molds from Mr. Tomko, that petitioner purchased any motel or restaurant equipment from Mr. Tomko, or that petitioner had $ 48 million of cash. Petitioners' various stories about the $ 48 million of cash are inconsistent and contradictory, do not comport with our life experience, and do not correspond with any reliable extrinsic evidence. Petitioners' alleged purchases of motel and restaurant furniture, fixtures, equipment, and supplies are inherently incredible in and of themselves. They are also contradicted by petitioner's testimony, petitioners' extrinsic evidence introduced to *312 support the purchases, and other witnesses' testimony. In addition to the sheer magnitude of the cash allegedly paid to Mr. Tomko, petitioners already owned the contents of the motel when petitioner allegedly purchased them, petitioner's testimony about the contents of the restaurant is contradictory, and from the limited record, 2,300 (much less 600) used glass molds do not appear to have a value approaching the $ 6 million that was allegedly paid (never mind the $ 35 million that was allegedly due). When petitioners purchased the Solomon property, it included an operating motel and its contents. Even if at some point Mr. Tomko leased and operated the Blue Moon Motel, [7] we do not believe that he or petitioners ever refurnished it. The condition of the Blue Moon furnishings, fixtures, and equipment on hand in 1988 indicates that they had come with the property in 1976. *313 At trial, petitioner identified a list of restaurant furniture, fixtures, equipment, and supplies as the contents of Hunan Gardens. This list included amounts that appeared to be the values of the items listed; [8] the amounts were totaled on each page; and the page totals were carried to a cover sheet on which the page totals were totaled. The grand total was $ 546,856. Petitioner testified that he had acquired the items on the schedule after Hunan Gardens did not pay its rent. However, the schedule was also included in the list of furniture, fixtures, equipment, and supplies that petitioner had testified he had acquired from Mr. Tomko for $ 9,316,041. On brief, Mr. Crawford stated that petitioners lost "$ 9,316,041.00 in furniture and supplies at the Blue Moon Motel and over $ 546,856 in fixtures and kitchen equipment from the Hunan Gardens Restaurant", apparently reviving petitioners' original story of how he acquired the contents of Hunan Gardens. Which story do we accept? Neither of them. *314 Petitioners' story about the glass molds is inherently incredible and is belied by reliable third-party evidence. The previous owner of Westmoreland testified that a new, intricate glass mold might cost $ 10,000. Petitioners and Mr. Crawford have seized upon that value [9] to assert that $ 6 million (not the original purchase price of $ 35 million) was "a bargain basement price" for the 2,300 molds allegedly purchased from Mr. Tomko. However, we look to other evidence for a more realistic indicator of a reasonable price for 2,300 used molds. The entire Westmoreland facility, land, factory, molds (including trademark), and equipment, had been sold for $ 800,000 in 1981. The auctioneer of the contents of the Westmoreland factory had sold a few used molds at auction for approximately $ 100 each, and about 100 used molds at private sales for $ 50 to $ 300 each. Petitioner had purchased approximately 2,000 used molds from Westmoreland in July 1988 for $ 30,000. We do not think that either of the multi-million dollar figures alleged by petitioner is a plausible purchase price for 2,300 used glass molds. *315 Petitioners' story (or more properly Mr. Crawford's interpretation of petitioner's story) about the other items lost from the Westmoreland factory does not correspond with independent witness' or petitioner's own testimony. On brief Mr. Crawford wrote that, in addition to the glass molds, "There were other items stolen from the factory as well of a value of between $ 300,000.00 and $ 500,000.00 but purchased along with the factory for $ 75,000.00." However, the previous owner of Westmoreland testified that the molds were all that was left at the factory when it was sold to petitioners, and petitioner testified that the stolen equipment had been purchased from unidentified sellers for "A couple hundred thousand, 300,000, 400,000, 500,000", and specifically that the stolen equipment had not been included in the purchase of the factory or the molds. Petitioners' assertions and Mr. Crawford's calculations to show that petitioners' gain from the sale of the Blue Moon property was $ 572,864, $ 811,333 less than was reported on the original 1988 Form 1040 or the 1988 Form 1040X, are not supported by extrinsic evidence, tax law, or common sense. Petitioners, through Mr. Crawford, assert *316 that they had received $ 634,333 less from the sale, had paid $ 55,000 more for the purchase, and had depreciated $ 173,745 less of the Blue Moon property than was reported on the original 1988 Form 1040 and the 1988 Form 1040X. Specifically, Mr. Crawford calculated that the $ 634,333 underpayment equaled Earnest money in the amount of $ 125,000.00 paid prior to the date in question, notes to be paid in subsequent years in the amount of $ 308,000.00[, and] * * * $ 61,333.00 of escrow funds were withheld from the petitioners and eventually paid to Oxford and not the cash basis petitioners and a sum of $ 140,000.00 to Vanguard Mortgage. [10]
*317 Petitioners assert that the $ 55,000 overpayment was a result of $ 40,000 that "they had to pay * * * to the Abriolas and another $ 15,000.00 paid upon refinancing." Mr. Crawford calculated the accumulated depreciation adjustment by multiplying the depreciation deduction for 1988 ($ 4,278) by the number of years that petitioners owned the Blue Moon property (11.5). Petitioners' assertion that they received less, paid more, and claimed less depreciation [11] *318 than they originally reported for the Blue Moon property is not supported by any extrinsic evidence, and does not overcome the admission included on their original 1988 Form 1040 and affirmed on their 1988 Form 1040X. [12]Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo. 1968-126; Siewert v. Commissioner, 72 T.C. 326, 337 (1979). Petitioners might have had more basis in the Blue Moon property than their basis in the Solomon property (e.g., basis in the Bogovich property). They might have lost more personal property at the Blue Moon Motel and the Westmoreland factory than the contents of the Blue Moon building that they had purchased from the Solomons (and had deducted as the basis of the Blue Moon property). However, petitioners did not set a reasonable course to substantiate their costs and their losses. They concocted tales of an underground vault, of shadowy *319 men, one who gives money and another who takes it, of a mob, who brazenly looted the Blue Moon building while policemen watched and laughed, and of conspiracies and death threats. Petitioners' stories were swamped by their incoherence and inconsistencies, and sunk by their failure to correspond with the evidence or any objective reality. We sustain respondent's disallowance of the $ 1,750,000 loss deducted on petitioners' original 1988 Form 1040. Issue 2: Property taxes
Respondent disallowed property taxes claimed as an expense of the Blue Moon Motel. Although there is some evidence that a portion of the proceeds from the sale of the Blue Moon property might have been withheld to pay property taxes, [13] petitioners offered no evidence to substantiate the amount withheld to pay property taxes, and they did not otherwise substantiate their claimed property tax deduction. Although we are permitted to apply the rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), petitioners have not provided sufficient evidentiary basis for estimating deductible expenditures. See Sivic v. Commissioner, T.C. Memo. 1993-54. Because *320 petitioners have the burden of proof, Rule 142(a), we sustain respondent's determination. Issue 3: Self-employment tax
Petitioners did not offer any evidence or make any argument to rebut respondent's determination that the disallowance of the claimed property tax deduction results in self-employment income and self-employment tax on that income. Although we do not understand why this is the only *321 self-employment income that petitioners were determined to have, [14] petitioners have the burden of proof, Rule 142(a), and they have not carried that burden. We sustain respondent's determination. Issue 4: Additions to tax
Respondent determined an addition to tax under section 6653(a)(1). For 1988, section 6653(a)(1) imposes an addition to tax equal to 5 percent of an underpayment if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. Negligence is the failure to exercise due care or the failure to act as a reasonable and prudent person. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *322 Petitioners bear the burden of proving that respondent's determination of negligence is erroneous. Rule 142(a). Petitioners provided no evidence that their underpayments were not due to negligence or intentional disregard of rules or regulations. Respondent's determination of an addition to tax under section 6653(a) is sustained. Respondent also determined an addition to tax for substantial understatement under section 6661. If there is a substantial understatement of income tax for any taxable year, section 6661(a) imposes an addition to tax equal to 25 percent of the underpayment attributable to the understatement. If the taxpayer either had "substantial authority" for, or adequately disclosed, the tax treatment shown on the return, the addition to tax will be proportionately reduced. Sec. 6661(b)(2). Petitioners bear the burden of proof on this issue. Rule 142(a). Petitioners provided no evidence to show that they had authority for their understatements, and their tax returns did not disclose *323 their understatements. Respondent's determination of an addition to tax under section 6661(a) is sustained. Decision will be entered under Rule 155. Footnotes
1. Plus 50 percent of the interest due on the deficiency.↩
2. Plus 50 percent of the interest due on $ 468 of the deficiency.↩
1. The record does not disclose whether this is the "Sentinel Savings Association" mortgage to which the property was subject when petitioners entered the contract for deed with the Solomons.↩
1. Inasmuch as the Blue Moon property appears to be mostly sec. 1250 property, it is not clear why petitioners reported the entire amount of the accumulated depreciation adjustment as sec. 1245 gain.↩
2. Although Mr. Crawford was given the opportunity to file a reply brief, he did not do so.↩
3. Petitioner did testify that he bought a "Couple million dollars worth of silver" from "various people". However, his testimony was vague, and the amount allegedly invested was insignificant compared to the amount allegedly sitting in his vault.↩
4. We assume that this story is somehow tied to petitioners' original "BUSINESS BAD DEBT Fires, Thefts, etc." deduction of $ 1,750,000 although we are not sure how. We mention it only as an example of petitioner's incredible stories.↩
5. The "Bill of Sale" states "Recieved [sic] from, George Snyder, Nine Million Three Hundred Sixteen Thousand Forty One Dollars Cash ($ 9,316,041) as full payment for the furniture, fixtures, equipment, supplies, etc., As per the attached inventory list", which included 600 "ANTIQUE GLASS MOLDS" for $ 6 million. The "Cash Reciept [sic]" states "Recieved [sic] from George Snyder, $ 6,000,000.00 cash, (six million dollars cash) as a partial payment on the molds and related items from Westmoreland Glass Company."↩
6. No royalties were reported on petitioners' 1986, 1987, or original 1988 Forms 1040, or their 1988 Form 1040X, although a 1988 check for $ 100 and two 1989 checks totaling $ 275 were produced at trial.↩
7. Petitioners asserted that they leased the Blue Moon Motel to Mr. Tomko, and introduced two leases to substantiate their assertion. The first lease document was a month-to-month net lease dated Jan. 1, 1986, and provided for rent of $ 1,000 per month. The second lease was for 4 months and then month-to-month, and was dated Sept. 20, 1988, 7 days before petitioner executed the settlement agreement with Oxford. The second lease provided for rent of $ 100 per month. Petitioners did not disclose either lease to Oxford although they did disclose the Hunan Gardens lease. On petitioners' tax returns for 1986, 1987, and 1988, they reported that they received rents on the Blue Moon Motel of $ 49,997, $ 48,084, and $ 221,647, respectively, and paid total expenses (excluding depreciation) of $ 101,357, $ 95,747, and $ 146,654, respectively. Again, we do not accept untrustworthy documentary evidence to substantiate petitioners' story, particularly when it is contradicted by other evidence.↩
8. Petitioner testified that he did not know if the amounts were the values, but went on to say they were "The costs that would be delegated to each item."↩
9. Petitioners tried to support that value with two letters that Mr. Crawford introduced "not to make an evaluation of the molds. * * * It's merely to let the Court have some idea of the value of molds". We do not accept the letters as any such thing.↩
10. Petitioners appear to be contending that, because they are cash basis taxpayers, only the cash they received at the execution of the settlement agreement was income, and the note receivable, the cash received earlier, and the liabilities and costs paid on their behalf were not income. Mr. Crawford does not appear to have read sec. 453 or 1001(b) or Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929). See Gorman v. Commissioner, T.C. Memo. 1995-268↩, in which the taxpayer, who was also represented by Mr. Crawford, unsuccessfully asserted that insurance proceeds withheld to pay his litigation expenses were not income.
11. We note that for 1986 and 1987 petitioners claimed depreciation deductions of $ 20,093 and $ 14,195, respectively, amounts which are much more consistent with the annual depreciation allowable on real property acquired in 1976, and with the accumulated depreciation adjustment reported on the original 1988 Form 1040, than Mr. Crawford's calculation.↩
12. In petitioners' brief, Mr. Crawford states: "On their amended tax return, * * * the petitioners claimed a gain of $ 1,163,073.00 on the sale of the property (the Blue Moon Motel)." Mr. Crawford appears to have picked up the amount reported as petitioners' total sec. 1231 gain as their gain on the sale of the Blue Moon property. However, the total sec. 1231 gain includes $ 1,818 of sec. 1231 gain from an installment sale and excludes $ 222,942 reported as sec. 1245 gain. Petitioners actually reported $ 1,384,197 of gain from the sale of the Blue Moon property.↩
13. The Sept. 27, 1988, settlement agreement with Oxford provided that, on that date, Oxford would pay petitioners "One Million One Hundred Fifty-three Thousand Dollars ($ 1,153,000) in cash or certified funds, together with Oxford's promissory note to Snyder in the amount of Three Hundred Eight Thousand Dollars ($ 308,000) in the form attached to the Agreement of Sale, less payment of the Vanguard Federal Savings mortgage and other closing costs as reflected on the closing statements attached hereto, made part hereof and marked Exhibit 'F'" (which was not attached to the settlement agreement introduced at trial).↩
14. Although petitioners reported $ 141,689 of income from their five motels for 1988, and $ 70,715 of income from the motel on which the property tax deduction was disallowed, petitioners did not report any self-employment income or tax for 1988, and respondent did not determine any in excess of the amount attributable to the disallowed property tax.↩